SEGEDY, Appellant and Cross–Appellee,

v.

CARDIOTHORACIC AND VASCULAR SURGERY OF AKRON,
INC., et al., Appellees and Cross–Appellants.

[Cite as *Segedy v. Cardiothoracic & Vascular Surgery of
Akron, Inc.,* 182 Ohio App.3d 768, 2009-Ohio-2460.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 24219.

Decided May 27, 2009.

770

772

Michael E. Edminister, for appellant and cross-appellee.

Stephen P. Griffin and Justin S. Greenfelder, for appellees and cross-appellants.

Dickinson, Judge.

## INTRODUCTION

{¶ 1} A jury determined that Dr. Robert Netzley proximately caused Christina Segedy's death by taking too long to complete a surgical procedure and by transferring her from the operating room before she was stable. The jury's verdict of $1,705,300 was reduced by the 22 percent comparative negligence assigned to Mrs. Segedy. Following the entry of judgment on the verdict, the trial court granted Netzley's motion for a new trial based on juror confusion regarding the interrogatory and verdict forms and the jury's reference to some excluded evidence regarding the length of the surgery. Mr. Segedy appealed the new-trial order and the comparative-negligence verdict. Netzley cross-appealed the new-trial order, arguing that judgment notwithstanding the verdict should have been entered in his favor.

{¶ 2} The judgment of the trial court is reversed because (1) the jury's interrogatory responses were consistent with the general verdict form following a reconciliation instruction that did not taint the verdict, and (2) references to the length of the surgery did not deprive Netzley of a fair trial. The trial court incorrectly denied Mr. Segedy's motion for judgment notwithstanding the verdict regarding contributory patient negligence because, based on the evidence, reasonable minds could only conclude that any lack of care by Mrs. Segedy in smoking or failing to follow her physicians' advice did not proximately cause her death. The trial court correctly denied Netzley's motion for judgment notwithstanding the verdict because reasonable minds could have differed regarding whether Netzley's actions proximately caused Mrs. Segedy's death.

## BACKGROUND

{¶ 3} At 30 years of age, Christina Segedy suffered from heart and lung problems likely caused by rheumatic fever. In June 2001, she saw Dr. Islam Ibrahim, a pulmonologist, who diagnosed mitral stenosis, meaning that her mitral valve was restricting the flow of blood through her heart. On Friday, September 21, 2001, Mrs. Segedy's cardiologist performed a heart catheterization to further evaluate the problem. The test revealed unobstructed coronary arteries, but critical mitral stenosis. The cardiologist called Netzley, a cardiothoracic surgeon, for a consult. Netzley scheduled mitral-valve-replacement surgery for Monday, September 24, 2001. Although the cardiologist advised Mrs. Segedy to remain in the hospital over the weekend, she signed herself out, explaining that she wanted to see her children before the surgery.

{¶ 4} On Monday morning, Netzley performed mitral-valve-replacement surgery. The procedure required that Mrs. Segedy's heart be stopped and clamped off temporarily while a machine did the work of her heart and lungs. When the procedure was finished, Netzley determined that Mrs. Segedy was stable and transferred her to the intensive-care unit.

{¶ 5} Soon nurses realized that Mrs. Segedy's heart was not pumping well and, along with Netzley, began a series of measures designed to improve heart function. They administered various medications and fluids and ran tests. Netzley re-opened Mrs. Segedy's chest and tried open heart massage. He also inserted a balloon pump to try to improve blood flow. After several hours, Netzley returned Mrs. Segedy to the operating room and placed her on a ventricular-assist device. After more tests, doctors informed Mr. Segedy that his wife was brain dead. Mrs. Segedy was removed from life support on September 28, 2001.

{¶ 6} Mrs. Segedy's husband, Ian Segedy, sued Netzley and his corporation, Cardiothoracic and Vascular Surgery of Akron, Inc., as well as Mrs. Segedy's

pulmonologist, Dr. Ibrahim, and his corporation, Summit Pulmonary & Internal Medicine Inc., for medical negligence. At trial, Mr. Segedy claimed that Ibrahim had violated the standard of care by failing to properly complete or reschedule a bronchoscopy, proximately causing Mrs. Segedy's death through a delay in diagnosis. Mr. Segedy accused Netzley of violating the standard of care by transferring Mrs. Segedy from the operating room too soon after surgery and by failing to immediately return her to the operating room for appropriate treatment thereafter, proximately causing her death. The jury returned a unanimous verdict in favor of Ibrahim and his corporation. The trial court entered judgment on that verdict, and it was not appealed. Thus, Ibrahim is not a party to this appeal.

{¶ 7} The jury also returned a general verdict for Mr. Segedy and against Netzley in the amount of $1,755,300. It was signed by only six jurors, one of whom had not signed the liability interrogatories supporting the verdict. After twice returning for further deliberations, the jury returned the final time with a reduced verdict against Netzley. The final verdict was signed by the same six jurors who had signed the liability and damages interrogatories. All eight of the jurors had also signed an interrogatory assigning 22 percent comparative negligence to Mrs. Segedy. The trial court denied Netzley's motion for a mistrial and entered judgment on the verdict for plaintiff, reduced by 22 percent for comparative negligence.

{¶ 8} One month later, the trial court denied Netzley's motion for judgment notwithstanding the verdict, but granted his motion for a new trial based on juror confusion and a response to an interrogatory referencing some evidence that had been excluded. Mr. Segedy appealed, arguing that a new trial was not warranted and that the trial court should have granted his motion for judgment notwithstanding the verdict regarding the assignment of comparative negligence. He also argued that the jury's comparative-negligence finding was against the manifest weight of the evidence. Netzley appealed, arguing that his directed-verdict motions and motion for judgment notwithstanding the verdict should have been granted because Mr. Segedy failed to prove proximate cause.

## PROXIMATE CAUSE

{¶ 9} Netzley's first and third assignments of error are that the trial court incorrectly failed to direct a verdict in his favor based on Mr. Segedy's failure to prove proximate cause. His second assignment of error is that the trial court incorrectly denied his motion for judgment notwithstanding the verdict on the same basis. Netzley has argued that Mr. Segedy's expert recanted his testimony during cross-examination and, therefore, failed to contradict Netzley's experts' assertion that, by the time Netzley had met her, Mrs. Segedy was too sick to

save. Mr. Segedy has responded that his expert testified that Netzley's actions following the surgery were the proximate cause of Mrs. Segedy's death and that he did not recant that testimony during cross-examination.

{¶ 10} An appellate court's review of the denial of a motion for judgment notwithstanding the verdict is identical to its review of the denial of a motion for directed verdict at the close of all the evidence. *Levey & Co. v. Oravecz*, 9th Dist. No. 21768, 2004-Ohio-3418, 2004 WL 1465635, at ¶ 6. An appellate court's review of the denial of either motion is de novo. Id. Either motion requires the court to construe the evidence most strongly in favor of the nonmoving party and determine whether, based on the evidence, reasonable minds could come to different conclusions regarding any determinative issue. Civ.R. 50(A)(4).

{¶ 11} In order to prove medical malpractice, the plaintiff has the burden to prove, by a preponderance of the evidence, that the defendant breached the standard of care owed to the plaintiff and that the breach proximately caused an injury. *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673, paragraph one of the syllabus. Netzley's motion challenged Mr. Segedy's proof of proximate cause. A medical-malpractice claim requires the plaintiff to "prove causation through medical expert testimony in terms of probability to establish that the injury was, more likely than not, caused by the defendant's negligence." *Roberts v. Ohio Permanente Med. Group, Inc.* (1996), 76 Ohio St.3d 483, 485, 668 N.E.2d 480. In order to prove his wrongful-death claim based on medical negligence, Mr. Segedy had the burden to prove, by a preponderance of the evidence, that the doctor deviated from the applicable standard of care in treating Mrs. Segedy and that the deviation more likely than not caused her death.

## SHEARS'S TESTIMONY

{¶ 12} Mr. Segedy's expert cardiothoracic surgeon, Dr. Larry Shears, testified that, in his opinion, Netzley deviated from the standard of care after the surgery by sending Mrs. Segedy out of the operating room before she was stable. According to Shears, "[Mrs. Segedy] should never have left [the operating room]," and when she started showing signs that her heart function was not improving with medicine, "she should have immediately gone back to the operating room" where a ventricular assist device could have been used to "act[ ] as a motor for the heart." Shears testified that he believed Netzley's delay in returning her to the operating room caused her death.

{¶ 13} According to Shears, "[e]verything in [her] chart suggests she was not doing well [after surgery]." After quickly taking steps to try to improve her heart function, the nurses paged Netzley. According to Shears, within 30

minutes of Mrs. Segedy's arrival in the intensive-care unit after the surgery, her test results revealed that she was "ready to arrest," that is, her heart was very close to stopping. Shears said that at that point, "you don't have any time to mess around, you need to help her out." He was critical of Netzley for waiting another three hours before returning Mrs. Segedy to the operating room. Shears testified on direct examination at trial:

Q. Do you have an opinion to a reasonable degree of medical certainty that that delay caused any decrease in her likelihood of survival?

A. It's my opinion that was the cause of her failure to survive.

Q. That was the cause of her death?

A. That's correct.

Q. That delay?

A. That's correct.

During cross-examination Dr. Shears testified:

Q. So today you're saying that she would have survived?

A. I'm not saying she would have survived.

Q. Can you state to a reasonable degree of medical probability that she would have survived? That's what I'm asking.

A. No.

Q. You can't, can you? You're engaging—

A. Nobody can say for sure.

\* \* \*

Q. What I'm asking is, you cannot say to a reasonable degree of probability that she would have survived if Dr. Netzley had done what you've espoused he should have done here?

A. I can't tell you what percentage of the time she would have survived if he had done that.

{¶ 14} Netzley has argued that the trial court should have directed a verdict in his favor because Shears recanted his testimony during cross-examination. He has cited a concurring opinion in *Galletti v. Burns Internatl.* (1991), 74 Ohio App.3d 680, 684, 600 N.E.2d 294 (Christley, P.J., concurring), for the proposition that "[w]hen a plaintiff expert recants a previous opinion on proximate cause, a directed verdict is proper." As this court has previously noted, that same concurring opinion also provides that " ' "[o]nce an expert properly states his professional opinion to a properly formed question as to probability, he or she has established a prima facie case as a matter of law." ' " *Jones v. Birney*, 9th Dist. No. 07CA009171, 2008-Ohio-2250, 2008 WL 2003142, at ¶ 20, quoting *Heath v. Teich*, 10th Dist. No. 03AP1100, 2004-Ohio-3389, 2004 WL 1446042, at ¶ 14,

quoting *Galletti,* 74 Ohio App.3d at 684, 600 N.E.2d 294 (Christley, P.J., concurring). Furthermore, " ' "[e]rosion of [an expert's] opinion due to effective cross-examination does not negate that opinion, rather it only goes to weight and credibility." ' " Id., quoting *Heath,* 2004-Ohio-3389, 2004 WL 1446042, at ¶ 14, quoting *Galletti,* 74 Ohio App.3d at 684, 600 N.E.2d 294 (Christley, P.J., concurring).

{¶ 15} There is an important difference between impeaching a witness's testimony and causing him to recant it. "A witness recants * * * by formally or publicly withdrawing or repudiating earlier testimony." *State v. Covender,* 9th Dist. No. 07CA009228, 2008-Ohio-1453, 2008 WL 834417, at ¶ 21 (Dickinson, J., concurring in part and dissenting in part), citing Black's Law Dictionary (7th Ed.1999) 1274. Impeaching a witness, on the other hand, involves "discredit[ing] his] veracity." Black's Law Dictionary (8th Ed.2004) 768.

{¶ 16} This court considered whether a witness had recanted her testimony in *State v. Covender,* 2008-Ohio-1453, 2008 WL 834417. As a young child, the witness accused her stepfather, Covender, of molesting her and testified against him at trial. Years later, the witness voluntarily came forward as an adult and submitted an affidavit in support of Covender's motion for a new trial. By affidavit, the witness testified that Covender had never hurt her or attempted to touch her inappropriately. Id. at ¶ 13. She explained that as a child, she had felt pressured to say what the adults around her wanted her to say. Id. At an evidentiary hearing on the motion, the witness was asked: "And your testimony is that what you stated in 1996 was not true?" Id. at ¶ 14. The witness responded, "Yes." Id.

{¶ 17} In determining whether a witness has recanted, a court "must determine whether [a witness] presented evidence, in the form of [the witness's] own formal or public statements, that, if believed, would convince the * * * court that [he or] she testified falsely" on a prior occasion. Id. at ¶ 21 (Dickinson, J., concurring in part and dissenting in part). In *Covender,* the witness testified that "what [she] stated [at trial] was not true." Id. at ¶ 14. Although it meets the definition of recantation, even this language may not be sufficient in certain circumstances. Id. at ¶ 16 (held insufficient for lack of foundation of personal knowledge based on memory problems).

{¶ 18} In this case, Mr. Segedy's expert testified on direct examination that Netzley sent Mrs. Segedy out of the operating room too soon, and his delay in returning her to the operating room was the proximate cause of her death. Mr. Segedy, therefore, established a prima facie case as a matter of law. See *Galletti,* 74 Ohio App.3d at 684, 600 N.E.2d 294 (Christley, P.J., concurring); see also *Jones,* 2008-Ohio-2250, 2008 WL 2003142, at ¶ 20. The subsequent erosion of

that proximate-cause opinion on cross-examination was not a recantation of it. Shears did not repudiate or withdraw his opinion that Netzley's actions following surgery proximately caused Mrs. Segedy's death. Any conflict between his answers to questions during direct examination and cross-examination may have affected the weight and credibility of his opinions, but did not, alone, serve to recant his prior testimony. It was for the jury to consider whether to believe Shears's direct-examination testimony.

■ {¶ 19} Netzley has also argued that the trial court should have directed a verdict in his favor because Mr. Segedy failed to present evidence to support his lost-chance claim. A lost-chance claim is applicable, however, only if the plaintiff is unable to meet the traditional burden of proving proximate cause. *McMullen v. Ohio State Univ. Hosp.* (2000), 88 Ohio St.3d 332, 339, 725 N.E.2d 1117. An expert may offer evidence of proximate cause through testimony that the causative event probably caused the harm. *Stinson v. England* (1994), 69 Ohio St.3d 451, 633 N.E.2d 532, at paragraph one of the syllabus. That is, that "there is a greater than fifty percent likelihood that it produced the occurrence at issue." Id. In this case, Shears testified to a reasonable degree of medical certainty that Netzley's delay in returning Mrs. Segedy to the operating room after prematurely removing her was the proximate cause of her death. Construing the evidence most strongly in favor of Mr. Segedy, reasonable jurors could have determined that Netzley's actions proximately caused Mrs. Segedy's death.

## THE CORONER'S CONCLUSIONS

■ {¶ 20} Netzley's third assignment of error is that the trial court incorrectly denied his motion for a directed verdict "based on the overwhelming weight of the evidence that * * * Mr. Segedy failed to meet his burden of proof." Netzley has relied on the autopsy results to argue that Mrs. Segedy died of a postoperative heart attack "due to severe coronary artery disease." He has argued that "[t]he coroner's conclusions were admissible as fact, and no expert disagreed with those findings." In response, Mr. Segedy has argued that his expert, Shears, disagreed with the autopsy findings, creating a question for the jury to decide.

■ {¶ 21} In disposing of either a motion for directed verdict or one for judgment notwithstanding the verdict, a court " 'must neither consider the weight of the evidence nor the credibility of the witnesses.' " *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.* (1998), 81 Ohio St.3d 677, 679, 693 N.E.2d 271, quoting *Wagner v. Roche Labs.* (1996), 77 Ohio St.3d 116, 119, 671 N.E.2d 252. The Ohio Supreme Court has held that a "coroner's factual determinations concerning the manner, mode and cause of the decedent's death, as expressed in the coroner's report and death certificate, create a nonbinding, rebuttable presumption concerning such facts in the absence of competent, credible evidence to

the contrary." *Vargo v. Travelers Ins. Co. Inc.* (1987), 34 Ohio St.3d 27, 30, 516 N.E.2d 226.

{¶ 22} According to the autopsy report, Mrs. Segedy died of "[a]cute myocardial failure" due to "[c]oronary artery insufficiency" due to "[a]therosclerotic coronary artery disease." The medical examiner's report indicated that Mrs. Segedy's heart failed because of significant blockage of a coronary artery. Contrary to Netzley's assertion that "[e]very expert agreed with the results of the autopsy," Shears strongly disagreed with the coroner's conclusion. Shears pointed to the results of the recent heart catheterization to support his opinion that although she may have had some coronary artery disease, it did not contribute to her death because it was not obstructing the flow of blood. He testified that coronary artery disease does not progress rapidly enough to have blocked the vessel and caused her death just three days after a heart-catheterization test revealed normal coronary arteries. At least two of Netzley's own experts seemed to agree that they could not reconcile the recent heart-catheterization results with the coroner's conclusion. Shears further explained that the medical examiner's findings were incorrect because they were based on assessment of a dead vessel with no blood flowing through it. According to him, the live vessel looked much different, as the recent heart-catheterization images revealed.

{¶ 23} Mr. Segedy presented competent, credible evidence contesting the medical examiner's assigned cause of death. The jury was free to believe Shears's testimony. Construing the evidence most strongly in favor of Mr. Segedy, reasonable jurors could have found that Netzley's actions rather than disease proximately caused Mrs. Segedy's death. Therefore, the trial court correctly denied Netzley's motions for directed verdict and judgment notwithstanding the verdict. Netzley's assignments of error are overruled.

## INTERROGATORIES INCONSISTENT WITH VERDICT

{¶ 24} Mr. Segedy's first assignment of error is that the trial court incorrectly granted Netzley's motion for a new trial based on juror confusion. Mr. Segedy has argued that the jury's answers to the interrogatories were consistent with the general verdict both before and after they were amended. He has argued that the requisite three-fourths of the jury signed interrogatory responses regarding deviations from the standard of care and proximate cause that supported the general verdict for the plaintiff against Netzley. Netzley has argued that initially, the interrogatories were inconsistent with the general verdict because the verdict contained only six signatures including that of one juror who had not signed the liability interrogatories. Netzley has further argued that the trial

court impermissibly tainted the jurors with a faulty instruction when it sent them back to reconcile the interrogatory responses and the verdict.

{¶ 25} Article 1, Section 5 of the Ohio Constitution and Civ.R. 48 require a jury verdict to be based on the concurrence of not less than three-fourths of the jury. "The essential purpose [of] * * * interrogatories is to test the correctness of a general verdict by eliciting from the jury its assessment of the determinative issues * * * in the context of evidence presented at trial." *Cincinnati Riverfront Coliseum Inc. v. McNulty Co.* (1986), 28 Ohio St.3d 333, 336–337, 28 OBR 400, 504 N.E.2d 415.

{¶ 26} Under Civ.R. 49(B), when the general verdict is consistent with the interrogatory answers, the court "shall" enter "the appropriate judgment upon the verdict and answers." If there is an inconsistency between the general verdict and one or more interrogatory answers, then the trial court "may" do one of three things: (1) enter judgment in accordance with the interrogatory answers, notwithstanding the general verdict, (2) return the jury for further consideration of the interrogatories and the general verdict, or (3) order a new trial. Id. When an interrogatory response is inconsistent and irreconcilable with the general verdict, the Ohio Supreme Court has held that "the clear, best choice [is] to send the jury back for further deliberations." *Shaffer v. Maier* (1994), 68 Ohio St.3d 416, 421, 627 N.E.2d 986.

{¶ 27} In this case, the interrogatory responses initially appeared to support the general verdict for the plaintiff. Three-fourths of the jury signed interrogatory responses finding that Netzley had deviated from the standard of care, proximately causing Mrs. Segedy's death. Three-fourths of the jury signed the general verdict for plaintiff, awarding $1,755,300 in damages. The confusion arose when the parties realized that it was not the same three-fourths of the jury who had signed the liability interrogatories and the general verdict.

{¶ 28} The same six jurors signed the forms agreeing to the answers to interrogatories one, two, and three. Interrogatory one asked, "Do you find by a greater weight of the evidence that Dr. Netzley failed to comply with the standard of care in his care and treatment of Christina Segedy?" Six jurors answered yes. Interrogatory two asked: "If you answered Yes to Interrogatory No. 1, please describe how Dr. Netzley failed to comply with the standard of care." The same six jurors who had answered yes to interrogatory one signed the form, answering: "1. excessive clamp time [and] 2. leaving operating room with patient unstable." Interrogatory three asked: "Do you find by the greater weight of the evidence that Dr. Netzley's failure to comply with the standard of care was a proximate cause of Christina Segedy's death?" The same six jurors who had signed interrogatories one and two signed this form, answering yes.

{¶ 29} The "GENERAL VERDICT FOR PLAINTIFF" form was completed with a checkmark indicating that the jury found "for the Plaintiff and against * * * Dr. Netzley." The general-verdict form also indicated that "the total amount of damages is $1,755,300, consistent with our total in Jury Interrogatory No. 11." Interrogatory 11 asked the jurors to "[s]tate the total amount of compensatory damages and reasonable funeral and burial expenses to the Plaintiff in the wrongful death action." The same six jurors who signed the general verdict form for the plaintiff signed this interrogatory, indicating that compensatory damages totaled $1,750,000 and funeral and burial expenses totaled $5,300. One of those six, however, had not signed the standard-of-care and proximate-cause interrogatories against Netzley.

## THE "SAME–JUROR RULE"

{¶ 30} The initial question for this court is whether the interrogatory responses were consistent with the general verdict. In order to answer that question, this court must consider whether a juror who has not signed interrogatory forms finding that the defendant breached a duty and proximately caused injury to the plaintiff may sign the general verdict form for plaintiff against that defendant. If the answer to that question is no, then the original verdict form in this case was invalid, as it was not rendered based on a concurrence of three-fourths of the jurors.

{¶ 31} In *O'Connell v. Chesapeake & Ohio RR. Co.* (1991), 58 Ohio St.3d 226, 236, 569 N.E.2d 889, the Ohio Supreme Court adopted the "same-juror rule" in comparative-negligence cases so that only those jurors who find liability (i.e., breach of duty and proximate cause) may participate in the decision apportioning liability among the parties. The court in *O'Connell* examined the law of other jurisdictions, describing two distinct lines of cases. The court cited several states that followed the same-juror rule because "a juror's finding as to whether liability exists is so conceptually and logically connected with apportioning fault that inconsistent answers to the two questions render that juror's vote unreliable and thus invalid." Id. at 233, 569 N.E.2d 889. Therefore, the courts held, only jurors who agreed with the majority regarding liability could participate in the apportioning of that liability in a comparative negligence case. Id. The court also cited several states that followed the "any-majority rule." Id. at 233, 569 N.E.2d 889. Under this rule, there is no requirement of individual juror consistency in voting. Id. at 233–235, 569 N.E.2d 889. Therefore, once three-fourths of the jury has found a party liable, dissenting jurors may " 'accept the majority's finding * * * and participate in apportioning liability.' " Id. at 234, 569 N.E.2d 889, quoting *Juarez v. Superior Court of Los Angeles* (1982), 31 Cal.3d 759, 768, 183 Cal.Rptr. 852, 647 P.2d 128.

{¶ 32} The Ohio Supreme Court held that in comparative-negligence cases, the same-juror rule applies to require individual voting consistency between interrogatory responses finding liability and apportioning it. *O'Connell*, 58 Ohio St.3d at 236, 569 N.E.2d 889. The court explained that it would be "illogical to require, or even allow, a juror to initially find a defendant has not acted causally negligently, and then subsequently permit this juror to assign some degree of fault to that same defendant." Id. at 235, 569 N.E.2d 889. The court described "the allocation of fault" as a "method through which a juror clarifies his or her finding that a party is causally negligent for the injury sustained." Id. at 236, 569 N.E.2d 889. On that basis, the court in *O'Connell* held the verdict for the defendant invalid because less than the requisite three-fourths of the jury had agreed that the plaintiff was more than 50 percent liable for her own injuries. Id. at 237, 569 N.E.2d 889.

{¶ 33} The Ohio Supreme Court did not adopt a strict application of the same-juror rule in all cases. In fact, the court pointed out in *O'Connell* that it was not willing to "extend [its] holding to reach" the application of the rule to "[a] jury's determinations as to liability and damages," as other jurisdictions had done. Id. at 232, 569 N.E.2d 889, fn. 3. The court emphasized that the same-juror rule " 'applies only to cases in which the answers are interdependent, not where they are separate and independent' " like those of liability and damages. Id. at 233, 569 N.E.2d 889, quoting *Veberes v. Knappton Corp.* (1988), 92 Or.App. 378, 759 P.2d 279, 280. A juror could logically find that the defendant was not liable, but agree that the plaintiff's damages total a certain amount. It is, however, illogical for a juror to find the defendant was not liable, yet sign a general verdict finding against him and awarding damages to the plaintiff. That is what happened in this case.

{¶ 34} One juror who had not agreed that Netzley had deviated from the standard of care or proximately caused Mrs. Segedy's death signed the verdict form awarding damages to Mr. Segedy. That juror's interrogatory responses were inconsistent and irreconcilable with the general-verdict form. The vote of that juror on the verdict form was invalid, rendering the verdict invalid because without her vote, the verdict remained supported by just five jurors.

{¶ 35} Netzley has argued that the verdict was also invalid because two jurors who had not found that Netzley deviated from the standard of care participated in the apportionment of fault. According to Netzley, "[u]nder *O'Connell*, this is plain error and grounds for a new trial." *O'Connell* does not support Netzley's position, however, because the court in that case remedied the situation by invalidating the improper votes. *O'Connell*, 58 Ohio St.3d at 237, 569 N.E.2d 889. This left less than three-fourths of the jury in agreement regarding the apportionment of liability. Id. In this case, all eight jurors signed interrogatory ten,

apportioning "the percentages of negligence that directly and proximately caused the Plaintiff's injuries and death." Therefore, even after excluding the votes of the two jurors who did not sign the liability interrogatories, the interrogatory apportioning 78 percent of the liability to Netzley remains based on the agreement of three-fourths of the jury. Therefore, the two invalid votes on interrogatory ten did not create any inconsistency between the interrogatories and the verdict.

## RECONCILIATION INSTRUCTIONS

{¶ 36} When instructing the jury regarding the need to reconcile the interrogatories and verdict, the trial court must be careful not to suggest or imply that the jury came to the wrong conclusion. *Phillips v. Dayton Power & Light Co.* (1996), 111 Ohio App.3d 433, 449, 676 N.E.2d 565, citing *De Boer v. Toledo Soccer Partners Inc.* (1989), 65 Ohio App.3d 251, 258, 583 N.E.2d 1004. The court should encourage the jury to consider whether the interrogatory answers represent their true intentions. Id. Ideally, the trial court will instruct the jury that "the interrogatory responses and general verdicts should be reconciled with each other" rather than insisting that they must reconcile them. *Perez v. Falls Fin. Inc.* (2000), 87 Ohio St.3d 371, 377, 721 N.E.2d 47. The trial court should also make it clear that neither the interrogatories nor the verdict controls the other, but that "the two should be harmonious." Id.

{¶ 37} In this case, the defense objected to the inconsistency before the court had discharged the jury. The court addressed the jury:

We have encountered a problem in checking the signatures of the people who signed the general verdict for the plaintiff and checking those of you who signed the Jury Interrogatories 1, 2 and 3.

The Jury Interrogatories 1, 2 and 3 deal with Dr. Netzley's failure to comply with the standard of care, the description of it, and then that you found it was a proximate cause.

The signatures on those do not match totally with the signatures on the general verdict for plaintiff and they should.

If you found—if you agreed that Dr. Netzley has failed to comply with the standard of care and that that was a proximate cause, then your name should probably be on the Plaintiff's verdict.

If you didn't agree with that, it probably shouldn't be on there.

Do you understand?

{¶ 38} Netzley's lawyer then asked to approach and informed the court, outside the presence of the jury, that he was "concerned that the jury is not understanding—that those jurors who signed Interrogatories 1, 2 and 3 in favor of the

plaintiff also need to sign the general verdict form." He continued, "The other thing, what you said to them was if you signed 1, 2 and 3, your name should be on that verdict form. I don't know that that's necessarily true." The court addressed the jury again, saying:

I'm trying to think of ways to say this without causing problems. It's just inconsistent that you would find for the Plaintiff if you didn't think Dr. Netzley was negligent; therefore, it's inconsistent to find a name on the general verdict for this Plaintiff that does not appear on the jury interrogatories.

It's also somewhat inconsistent that there is a name on the interrogatories that doesn't appear on the general verdict form.

Do you understand?

If you agreed that Dr. Netzley failed to comply, then your name should appear on Jury Interrogatory No. 1, and those same people—well, not necessarily. Jury Interrogatory No. 3 is a little different, did his failure to comply with the standard of care, was it a proximate cause, but if your name's on both of those, in all likelihood it would appear on the general verdict for Plaintiff. Wouldn't have to.

Go back and see if you can clear this up.

{¶ 39} Neither party objected to this reconciliation instruction. After additional deliberation, the jury returned the forms, having made two changes to the general-verdict form. The juror who had signed the general verdict without signing the liability interrogatories had crossed out her name on the verdict form. The juror who had signed the liability interrogatories, but had not previously signed the verdict form, had added her name as the sixth vote in favor of the verdict for the plaintiff.

{¶ 40} The trial court asked the juror who had added her signature to the verdict whether she had found that Netzley had violated the standard of care. She said that she had. The court asked whether she had found that his violation of the standard of care was a proximate cause of Mrs. Segedy's death. She said that she had. The court finally asked her whether she was in agreement with the general verdict for the plaintiff. She said that she was. The court then asked the lawyers whether they had additional questions. After conferring with counsel, the trial court asked the same juror, who had initially refused to sign the general-verdict form, whether she "agree[d] with the amount." The juror answered:

No. That was my issue. We thought the people that agreed on that form had to sign the verdict form. That's why my name wasn't on the verdict form.

The trial court then spoke again to the jury.

I know these things are very confusing, but I'm going to need you to go back and redo some stuff.* * *. At least six people who agree on the amount are

the ones who sign the general verdict, but you have to have an agreement on the amount to agree on the verdict, okay?

Now, if six people agree on the amount and agree on the verdict and two other people also said yes, it should be a verdict for the plaintiff, but if you don't agree on the amount, don't do anything, okay? * * * We're going to give you a clean set. * * * We'll give you the interrogatories that apply to Dr. Netzley. You can rethink them if other people—if all eight want to sign, seven, six, but we have to have—they have to be consistent.

Neither party objected to the court's final reconciliation instruction. At that point, the jury began deliberations with clean forms.

{¶ 41} When they returned to the courtroom, the liability interrogatories against Netzley, one through three, were filled out in exactly the same manner as the original set. The same six jurors signed each of the three forms finding liability against Netzley for precisely the same violations of the standard of care described in the jury's initial response to interrogatory two. In response to interrogatory eleven, the amount of compensatory damages had been decreased by $50,000 from the original response to that interrogatory. The final response to interrogatory eleven indicated that six jurors agreed that the plaintiff's compensatory damages totaled $1,700,000 and the funeral and burial expenses were $5,300. The same six jurors signed interrogatories one, two, three, and eleven. The "GENERAL VERDICT FOR PLAINTIFF" form was filled out and signed by the same six jurors who had signed the liability and damages interrogatories. The general verdict awarded $1,705,300 to the plaintiff, consistent with the answer to interrogatory eleven.

{¶ 42} Before the trial court dismissed the jury, Netzley moved for a mistrial, arguing that the jury was "confused with [the] process" and that "[t]here is not a general consensus either on liability or damages." The trial court disagreed and entered judgment against Netzley. One month later, the trial court denied Netzley's motion for judgment notwithstanding the verdict, but granted his alternative motion for a new trial based on juror confusion and the inclusion of a reference to excluded evidence in the responses to the jury interrogatories.

{¶ 43} Mr. Segedy has argued that the trial court incorrectly ordered a new trial when the interrogatory responses were consistent with the general verdict, and the court had not tainted the jury with its reconciliation instructions. In response, Netzley has argued that the trial court ordered a new trial because it realized it had invaded the province of the jury by suggesting "how to resolve the inconsistency in order to award a plaintiff's verdict."

{¶ 44} There is nothing in the trial court's judgment entry to support Netzley's assertion that the trial court ordered a new trial because it believed its

reconciliation instructions were inappropriate. The court said only that "the judgment in this case should be set aside, and a new trial held" because of "the confusion displayed by the jury as shown in the answers to the interrogatories, and the inclusion therein of a finding of negligence [against Netzley] * * * partly because of the long clamp time, which this Court had disallowed as a claim for negligence." The judgment entry does not refer to the reconciliation instructions at all. In any event, the court did not impermissibly coach the jury to change its responses to find in favor of either party.

{¶ 45} Jury interrogatories are useful to ascertain a jury's true intentions. *Phillips v. Dayton Power & Light Co.* (1996), 111 Ohio App.3d 433, 449, 676 N.E.2d 565. In this case, the intent of the jury regarding the liability of Netzley was clear from the initial responses, and that intent did not change with further deliberation. The only inconsistency involved the personal voting consistency of one juror as between liability interrogatory responses and the verdict for the plaintiff. The jury returned the second time with another invalid verdict. Although the juror who had found Netzley liable but initially refused to sign the verdict had signed it, she still had not signed interrogatory eleven, regarding damages. When the court questioned that juror, it became clear that she had not agreed with the other five jurors regarding the amount of damages.

{¶ 46} The reconciliation instructions did not improperly suggest that the jurors had made the wrong decision about damages or anything else. The court told them that they "have to have an agreement on the amount to agree on the verdict." The court also told them not to do anything if they did not agree on the amount. This language allowed for the possibility that they may not reach a verdict. The court made it clear that they should "rethink" "the interrogatories that apply to Dr. Netzley." They were given clean forms, and after further deliberation, they returned with three liability interrogatories answered in precisely the same manner as they had been the first time, including the same six signatures.

{¶ 47} The reconciliation instructions were not ideal, but they do not indicate that the trial court attempted to impose its will on the jurors. " 'A jury charge must be considered as a whole and a reviewing court must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights.' " *Perez v. Falls Fin. Inc.* (2000), 87 Ohio St.3d 371, 376, 721 N.E.2d 47, quoting *Becker v. Lake Cty. Mem. Hosp. W.* (1990), 53 Ohio St.3d 202, 208, 560 N.E.2d 165. In this case, despite its imperfections, the charge, as a whole, did not mislead the jury. It seems that the instruction did precisely what it was intended to do. It cleared up the misconception the jury had, based on the instructions to the interrogatories, regarding who should sign the verdict. Without influencing the jurors in favor of either party,

the trial court instructed them to reconsider each of the interrogatory responses and the general verdict regarding Netzley.

{¶ 48} The jurors returned the final time, having made only one substantive change from their original responses. The jury solved the impasse by compromising on the amount of damages. The jury's final response to interrogatory eleven reduced the compensatory damages by $50,000. The same six jurors agreed that Netzley had violated the standard of care, that his violation was a proximate cause of Mrs. Segedy's death, and that the damages totaled $1,705,300. There was no inconsistency between the final interrogatory responses and the final verdict. Therefore, under Civ.R. 49(B), the trial court had no discretion to order a new trial on that basis.

## ASK AND YOU SHALL RECEIVE

{¶ 49} The trial court indicated that its new trial order was based in part on the jury's response to interrogatory two, regarding Netzley's violations of the standard of care. The jury had responded to that interrogatory, on each occasion, with a reference to "excessive clamp time." The trial court noted that it had excluded evidence that the amount of time Mrs. Segedy was on the bypass machine during surgery (i.e., "clamp time") was a violation of the standard of care. As part of his first assignment of error, Mr. Segedy has argued that the trial court incorrectly ordered a new trial because the verdict was valid based on the jury's complete response to interrogatory two, regardless of the jury's reference to clamp time.

{¶ 50} Interrogatory two asked the jury to "describe how Dr. Netzley failed to comply with the standard of care." The question was followed by blank lines on which the jury wrote: "1. excessive clamp time [and] 2. leaving operating room with patient unstable." The parties agree that the second basis was a theory of liability presented to the jury through expert testimony. The parties also seem to agree that "excessive clamp time" was not a theory properly presented to the jury because the trial court granted a motion in limine on that topic during the trial. The court excluded the testimony based on unfair surprise because it determined that Shears had not previously testified to that criticism during his deposition.

{¶ 51} In regard to this issue, Netzley has argued at length regarding the "misconduct" of Mr. Segedy's counsel and his expert, Shears. It appears that Netzley has argued that the new-trial order was justified under Civ.R. 59(A)(1). Civ.R. 59(A)(1) permits a new trial in the event that "[i]rregularity in the proceedings of the court, jury, * * * or prevailing party, or any order of the court, * * * or abuse of discretion * * * prevented * * * a fair trial."

{¶ 52} Although Netzley moved in limine to exclude any new standard-of-care opinions not previously disclosed at deposition, the trial court did not grant the motion until Netzley objected during Shears's direct-examination testimony. Just before the objection, Shears explained that 101 minutes "is very long, particularly in a sick heart * * * that has a bad ventricle[,] * * * particularly a right ventricle * * *. * * * [T]hat is an exceptionally long period of time to keep the heart stopped and * * * expect it to restart and be able to provide the circulatory support that it needs." After the court questioned Shears outside the presence of the jury, it excluded his opinion that Netzley had deviated from the standard of care by permitting such a long clamp time, but denied Netzley's motion to strike the last answer. Thus, contrary to Netzley's implication, the trial court did not exclude any reference to long clamp time.

{¶ 53} During direct examination by Mr. Segedy's lawyer, in accordance with the court's ruling, Shears never testified that the long clamp time was a deviation from the standard of care. To the contrary, he testified that "chronologically * * * [Dr. Netzley's] first deviation from the acceptable standard of care" occurred when he sent Mrs. Segedy from the operating room before she was stable.

{¶ 54} During cross-examination, however, Netzley's own lawyer asked Shears, "You're not critical about the length of this surgery, correct?" Shears answered:

> I still to this point in time think that the clamp time of 101 minutes on a sick heart is excessive. In a normal heart a clamp time of 101 minutes is acceptable. In this case it doesn't matter what I said in that deposition that you're going to read here in a few minutes, but 101 minutes as proved by the fact that I'm sitting here today, we're all sitting here today, is excessive. * * * [I]t's not unheard of to have an operation that's that long, but in her case it was too long. Otherwise her heart would have been able to sustain her. I'm not saying they deviated from any standard of care in this particular point in terms of her survival. The clamp time was what ultimately caused her heart to fail. It's not what caused her—in my opinion, her death. Her death was the inaction in response to the failure that occurred.
>
> Mr. Griffin: Unresponsive, Doctor. I move to strike, Your Honor.
>
> The Court: Well, I think he answered what you asked him.

Netzley has now argued that this exchange is evidence of Shears's "misconduct." Netzley has argued that "[t]he witness does not have unfettered right and free reign to testify on any matter he pleases." It is not the witness's job, however, to ensure compliance with in limine evidentiary rulings, and this is not a case of a savvy expert testifying "on any matter he pleases." According to Shears, he had never before testified as an expert witness. Furthermore, his answer was responsive to a question asked by Netzley's lawyer, not Mr. Segedy's lawyer.

Therefore, to the extent this testimony caused the jury to become confused about whether Netzley deviated from the standard of care via clamp time, Netzley invited it by asking the question. Netzley cannot take advantage of juror confusion that he created. See *State ex rel. Downs v. Panioto*, 107 Ohio St.3d 347, 2006-Ohio-8, 839 N.E.2d 911, at ¶ 32, quoting *State ex rel. Kline v. Carroll*, 96 Ohio St.3d 404, 2002-Ohio-4849, 775 N.E.2d 517, at ¶ 27.

{¶ 55} Furthermore, even though Shears appears to have testified during cross-examination that the clamp time violated the standard of care, he also testified that it did not proximately cause Mrs. Segedy's death. Shears did not testify that Netzley was liable for the death based on excessive clamp time, so this issue could not support a verdict against Netzley in any event. It is difficult to see how Netzley could have been prejudiced by Shears's testimony. Although Netzley has noted various occasions in the transcript of either Mr. Segedy's lawyer or Shears mentioning clamp time, his argument is based on the misconception that this amounted to misconduct. The record reveals that Mr. Segedy's lawyer did not violate the trial court's order prohibiting a standard-of-care opinion regarding clamp time.

{¶ 56} Netzley has cited *Chesney v. Brunner* (May 22, 1975), 10th Dist. No. 74AP–557, 1975 WL 181375, as authority for the proposition that "a court cannot simply ignore an interrogatory answer based on improper evidence." In *Chesney*, the trial court ordered a new trial because interrogatory responses revealed that the jury had considered an extra element of damages, one that had apparently not been authorized by the trial court. Id. at *5. The facts of *Chesney* are readily distinguished from the facts of this case. The jury in this case did not incorrectly inflate the damages award, as the jury in *Chesney* had done. Netzley was not prejudiced by the jury's consideration of excluded evidence regarding the standard of care. Each violation of the standard of care was an independent basis for liability. Therefore, the reference to clamp time was harmless.

{¶ 57} Netzley has also argued that a jury may not base its verdict on grounds not supported by the evidence. The reference to clamp time in response to interrogatory two, however, does not affect the fact that three-fourths of the jury found that Netzley violated the standard of care by leaving the operating room before Mrs. Segedy was stable. There is no dispute that that was an independent, valid basis for the verdict against Netzley. Therefore, the references to clamp time by experts and lawyers did not affect the fairness of the trial.

{¶ 58} Furthermore, the jury's reference to clamp time in response to interrogatory two was not inconsistent with the general verdict for the plaintiff. Regardless of the trial court's ruling on the standard-of-care issue, the evidence did not support the jury's finding that the clamp time proximately caused Mrs. Segedy's

death. If the reference to clamp time in response to interrogatory two is deleted, the fact remains that three-fourths of the jury found that Netzley had deviated from the standard of care by leaving the operating room too soon after the surgery. Therefore, interrogatory two remains consistent with the general verdict. Under Civ.R. 49(B), the trial court had no discretion to order a new trial when the interrogatories were consistent with the general verdict. Mr. Segedy's first assignment of error is sustained.

## COMPARATIVE NEGLIGENCE

{¶ 59} Mr. Segedy's second assignment of error is that the trial court incorrectly denied his motion for judgment notwithstanding the verdict as it pertained to the assignment to Mrs. Segedy of 22 percent comparative negligence. He has argued that there was no evidence that anything Mrs. Segedy did or failed to do proximately caused her death. Netzley has argued that "[Mrs. Segedy's] negligence in failing to follow her physicians' medical advice and her long history of smoking contributed to her death."

{¶ 60} Netzley has first argued that Mr. Segedy forfeited this argument by failing to move for a directed verdict on this basis at the close of all evidence or otherwise object to the jury instruction or interrogatories on this issue before the case went to the jury. In support of his position, Netzley has cited an Eighth District Court of Appeals opinion involving a plaintiff who after failing to object to a jury instruction, assigned the giving of that instruction as error on appeal. See *Faber v. Syed* (July 7, 1994), 8th Dist. No. 65359, 1994 WL 326151 at *8. *Faber* does not support Netzley's position. Mr. Segedy was not required to object or otherwise challenge the sufficiency of the evidence prior to moving for judgment notwithstanding the verdict. See Civ.R. 50(B) (motion for judgment notwithstanding the verdict does not require a previous directed verdict motion).

{¶ 61} To prove the affirmative defense of contributory negligence, the defendant must prove that the plaintiff breached a duty, proximately causing her own injury. Thus, the plaintiff's own "want of ordinary care * * * [must have] combined and concurred with the defendant's negligence and contributed to the injury as a proximate cause thereof, and as an element without which the injury would not have occurred." *Brinkmoeller v. Wilson* (1975), 41 Ohio St.2d 223, 226, 70 O.O.2d 424, 325 N.E.2d 233. In medical-negligence cases, "such negligence must be contemporaneous with the malpractice of the physician." *Lambert v. Shearer* (1992), 84 Ohio App.3d 266, 284, 616 N.E.2d 965; see also *Viox v. Weinberg,* 169 Ohio App.3d 79, 2006-Ohio-5075, 861 N.E.2d 909, at ¶ 12–14 (in missed-diagnosis case, patient's failure to follow doctor's advice to have a second chest x-ray in year following defendant doctor's negligent reading of first x-ray was not contemporaneous with defendant's negligence). Therefore, "it is

improper to suggest \* \* \* that the negligent conduct of the patient prior to coming under the care of the defendant physician could serve to constitute [contributory patient] negligence." *Lambert*, 84 Ohio App.3d at 284, 616 N.E.2d 965 (physician could not base contributory-negligence defense on patient's 30–year history of smoking, because physician accepted the patient for treatment "as he was").

 ██ {¶ 62} Disregarding a physician's orders may constitute contributory patient negligence if there is also evidence that it was "an active and efficient contributing cause of the injury that is the basis of the patient's claim." *Viox*, 169 Ohio App.3d 79, 2006-Ohio-5075, 861 N.E.2d 909, at ¶ 13; see also *Sorina v. Armstrong* (1988), 51 Ohio App.3d 113, 115–116, 554 N.E.2d 943 (plaintiff's expert testified that injury was caused by doctor's failure to diagnose and treat complication following elective abortion, but evidence indicated that patient proximately caused her own injury by failing to follow defendant physician's advice to return for follow-up care). In order to offer admissible evidence of proximate cause, an expert must testify that the causative event probably caused the harm. *Stinson v. England* (1994), 69 Ohio St.3d 451, 633 N.E.2d 532, at paragraph one of the syllabus. That means that "there is a greater than fifty percent likelihood that it produced the occurrence at issue." Id.

{¶ 63} In this case, interrogatory seven asked the jury whether the plaintiff was negligent. All eight jurors signed the affirmative response. Interrogatory eight asked: "If you answered <u>Yes</u> to Interrogatory No. 7, please describe how the Plaintiff was negligent?" The jury responded: "Failing to comply with medical instruction and advice. Smoking." All eight jurors signed interrogatory eight as well. Interrogatory nine asked whether the jury found "by a greater weight of the evidence that the Plaintiff's negligence was a proximate cause of death?" All eight jurors signed the affirmative response. Interrogatory ten asked the jury to "[s]tate the percentages of negligence that directly and proximately caused the Plaintiff's injuries and death." All eight jurors signed the response, assigning 22 percent of the negligence to the plaintiff and 78 percent to Netzley.

## FAILING TO FOLLOW MEDICAL ADVICE

 {¶ 64} Netzley has pointed to the testimony of Mrs. Segedy's pulmonologist and her cardiologist regarding her failure to follow up and schedule additional tests as instructed after her June 2001 echocardiogram revealed moderate mitral stenosis. According to Netzley, the testimony indicated that Mrs. Segedy's mitral stenosis progressed rapidly between June and September. Netzley testified, however, that he had not become involved in Mrs. Segedy's care until September 21, 2001. Therefore, any failure on her part to follow up with her

doctors in the summer of 2001 could not have "combined and concurred with [Netzley's] negligence" to proximately cause her death. See *Brinkmoeller v. Wilson* (1975), 41 Ohio St.2d 223, 226, 70 O.O.2d 424, 325 N.E.2d 233. Netzley agreed to undertake the care and treatment of Mrs. Segedy as he found her on September 21, 2001. See *Lambert v. Shearer* (1992), 84 Ohio App.3d 266, 284, 616 N.E.2d 965.

{¶ 65} Netzley also argued that the evidence revealed that Mrs. Segedy had signed herself out of the hospital against medical advice the Friday before her Monday surgery. He has failed, however, to point to any expert testimony tending to show that Mrs. Segedy's absence from the hospital over the weekend more likely than not was a cause of her death. A review of the trial transcript failed to reveal any such evidence. Without evidence of proximate cause, reasonable jurors could not find that Mrs. Segedy was liable for her own death due to her failure to follow the advice of her cardiologist to stay in the hospital over the weekend before her surgery.

## SMOKING

{¶ 66} Netzley has pointed to the testimony of Dr. Robert Gorman, a cardiovascular-surgery expert. According to Netzley, Gorman testified that "[Mrs. Segedy's] '30-pack-a-year' smoking history contributed to her death preoperatively." Netzley has also argued that Mr. Segedy's expert, Shears, testified "that smoking could contribute to operative complications." Shears testified that smoking "increases your risk of pneumonias perioperatively," but does not substantially increase the risk of death from mitral valve surgery. Not only did Shears not testify that smoking increases the risk of the kind of complications Mrs. Segedy suffered, but he did not testify on this topic in terms of Mrs. Segedy's case at all. His testimony did not provide any evidence that Mrs. Segedy's smoking probably was a cause of her death. Gorman testified that Mrs. Segedy's history of smoking "contributed to her risk preoperatively," but her history of smoking was not contemporaneous with Netzley's negligence. See *Lambert*, 84 Ohio App.3d at 284, 616 N.E.2d 965. A history of smoking, even coupled with expert testimony that smoking can cause postoperative complications, is not evidence of Mrs. Segedy's contributory negligence.

{¶ 67} Netzley has also argued that "[Mrs. Segedy's] decision not to stop smoking for two weeks and delay surgery was a contemporaneous factor that increased her operative risk." In support of this argument, he has pointed to his own testimony that Mrs. Segedy refused his offer to briefly postpone the surgery for that purpose and the testimony of Dr. Thomas Lee, the treating anesthesiologist, who testified that Mrs. Segedy's history of smoking affected her poor cardiac-output values.

{¶ 68} Netzley did not mention, and this court has not found, any evidence indicating that Mrs. Segedy's refusal to stop smoking for two weeks prior to surgery probably was a cause of her death. In fact, Netzley testified that smoking increased the risk of postoperative pneumonia, not the complications that occurred after Mrs. Segedy's surgery. Without evidence of proximate cause, a reasonable juror could not conclude that Mrs. Segedy's decision constituted contributory patient negligence.

{¶ 69} Construing the evidence most strongly in favor of Netzley, reasonable jurors could only conclude that any lack of care by Mrs. Segedy in smoking or failing to follow her physicians' advice did not proximately cause her death. Therefore, the trial court incorrectly denied Mr. Segedy's motion for judgment notwithstanding the verdict to the extent that the jury assigned 22 percent comparative negligence to Mrs. Segedy. Mr. Segedy's second assignment of error is sustained.

{¶ 70} Mr. Segedy's third assignment of error is that the verdict finding Mrs. Segedy partially at fault for her own death was against the manifest weight of the evidence. This assignment of error is rendered moot by this court's disposition of Mr. Segedy's second assignment of error and is overruled on that basis.

## CONCLUSION

{¶ 71} Netzley's assignments of error are overruled because reasonable jurors could have determined that Netzley's actions proximately caused Mrs. Segedy's death. Mr. Segedy's first assignment of error is sustained; the trial court was incorrect in ordering a new trial because (1) the jury's interrogatory responses were consistent with the general-verdict form following a reconciliation instruction that did not taint the verdict, and (2) references to excessive clamp time did not deprive Netzley of a fair trial. Mr. Segedy's second assignment of error is sustained; the trial court incorrectly denied his motion for judgment notwithstanding the verdict regarding comparative negligence because, based on the evidence, reasonable jurors could only conclude that any lack of care by Mrs. Segedy in smoking or failing to follow her physicians' advice did not proximately cause her death. The judgment of the Summit County Common Pleas Court is reversed, and the cause is remanded for the trial court to enter judgment on the jury's verdict without reducing it for comparative negligence.

Judgment reversed
and cause remanded.

MOORE, P.J., and WHITMORE, J., concur.