[Cite as *Hayward v. Summa Health Sys.*, 2015-Ohio-163.]

STATE OF OHIO        )                  IN THE COURT OF APPEALS
                         )ss:            NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT     )

THERESA HAYWARD             C.A. No.     25938

      Appellant

      v.                              APPEAL FROM JUDGMENT
                                 ENTERED IN THE
SUMMA HEALTH SYSTEM, et al.     COURT OF COMMON PLEAS
                                 COUNTY OF SUMMIT, OHIO
      Appellees             CASE No.     CV 2009 03 2529

DECISION AND JOURNAL ENTRY

Dated: January 21, 2015

BELFANCE, Presiding Judge.

{¶1}   This case is before this Court upon remand from the Supreme Court of Ohio. For the reasons set forth below, we affirm.

I.

{¶2}   This Court previously recounted much of the history of this case:

Following bouts of diverticulitis, Ms. Hayward elected to have a portion of her sigmoid colon removed in an attempt to remedy the problem. On October 10, 2007, Defendant-Appellee Dr. Michael Cullado, M.D., and Defendant-Appellee Dr. Steven Wanek, M.D., a fifth-year surgical resident employed by Defendant-Appellee Summa Health System ("Summa"), performed the partial colectomy on Ms. Hayward. In the days following the surgery, Ms. Hayward developed weakness and loss of sensation in her left leg. Following a neurology consult by Dr. Robert Lada, M.D., Dr. Lada determined that Ms. Hayward suffered a nerve injury to the left femoral nerve during the surgery. After conducting a differential diagnosis as to the cause of the nerve injury, Dr. Lada concluded that the injury occurred due to a prolonged compression of the nerve during surgery. He further concluded that, because there was no other evidence of the typical causes of femoral neuropathy,[1] the nerve injury was likely secondary to a retractor injury.

---

[1] "Common causes of femoral nerve injury, also known as femoral neuropathy include preexisting weakness, diabetes or retroperitoneal hematoma. After conducting tests and

The retractor in this case, a Bookwalter retractor, was used so that the anatomical structures at issue could be accessible and other structures not involved in the surgery could be held out of the way so as not to be damaged or compromised during the surgery. Ms. Hayward was discharged from the hospital on October 26, 2007. Four months later, in the discharge summary dictated by Dr. Wanek and signed by Dr. Cullado, the doctors also indicated that the neuropathy was likely secondary to a retractor injury.

Prior to the surgery, Ms. Hayward had no problems with weakness or sensation in her leg and had no difficulty walking. Upon discharge, Ms. Hayward had to use a wheelchair to leave the hospital. Over time and many months of physical therapy, Ms. Hayward progressed to being able to walk with assistance of a walker, and finally with only the assistance of a cane. Nevertheless, Ms. Hayward continues to have problems with her left leg; she cannot stay in one position for prolonged periods of time and is most comfortable when lying down. Experts believe it is statistically unlikely that Ms. Hayward's condition will dramatically improve, that her injury is likely permanent, and that she will not be able to find work given her physical limitations and skill set.

On March 31, 2009, Ms. Hayward filed a complaint against Summa, Dr. Cullado, Dr. Spear, Advanced Urology Associates, LLC, Dr. Wanek, Dr. Reedus, and several John and Jane Doe Defendants alleging that the Defendants were negligent in providing medical care to Ms. Hayward, that they deviated from the standard of care, that as a proximate result of the negligence they caused injury and pain and suffering to Ms. Hayward, and that as a result Ms. Hayward has incurred numerous expenses and lost wages and earnings. Subsequently, Ms. Hayward filed motions pursuant to Civ.R. 41(A)(1) to dismiss Defendants Dr. Spear, Dr. Reedus, and Advanced Urology Associates, LLC.

The matter proceeded to a jury trial. The jury concluded that Dr. Cullado and Summa were not liable, that Dr. Cullado and Summa by and through Dr. Wanek were not negligent in the care and treatment of Ms. Hayward, and that they did not cause injury to Ms. Hayward. Ms. Hayward filed a motion for judgment notwithstanding the verdict ("JNOV") and a motion for a new trial. Both were subsequently denied by the trial court.

*Hayward v. Summa Health Sys.,* 9th Dist. Summit No. 25938, 2012-Ohio-5396, ¶ 2-5. Ms.

Hayward then appealed, raising five assignments of error for our review. *Id.* at ¶ 5.

{¶3} This Court overruled Ms. Hayward's third assignment of error addressing the trial

court's denial of her motion for a directed verdict, *id.* at ¶ 6-10; however, we sustained Ms.

---

examining Ms. Hayward, Dr. Lada eliminated these possible causes." *Hayward v. Summa Health Sys.,* 9th Dist. Summit No. 25938, 2012-Ohio-5396, ¶ 2, fn. 1.

Hayward's fifth assignment of error concluding the trial court committed reversible error in instructing the jury on remote cause. *Id.* at ¶ 17. We declined to address the remaining assignments of error, concluding they were moot. *Id.* at ¶ 18.

{¶4} The matter was appealed to the Ohio Supreme Court. While the Supreme Court declined to review whether this Court was correct in concluding a remote cause instruction was not warranted, it did agree to review whether instructing the jury on remote cause in this case was reversible error. *See Hayward v. Summa Health Sys./Akron City Hosp.,* 139 Ohio St.3d 238, 2014-Ohio-1913, ¶ 23. The Supreme Court concluded that this Court "erroneously found prejudicial error in the remote-cause jury instruction." *Id.* at ¶ 33. The Supreme Court reversed the portion of our judgment granting a new trial, and remanded the matter for this Court to address the assignments of error that we previously determined were moot. *Id.*

{¶5} Accordingly, we turn to addressing Ms. Hayward's first, second, and fourth assignments of error. They will be addressed out of sequence to facilitate our review.

II.

ASSIGNMENT OF ERROR I

THE JURY'S VERDICT IN THIS MATTER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶6} Ms. Hayward asserts in her first assignment of error that the jury's verdict was against the manifest weight of the evidence. We do not agree.

{¶7} The Supreme Court of Ohio has concluded that, in reviewing whether a verdict is supported by the weight of the evidence in civil cases,

> [t]he [reviewing] court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.

(Internal quotations and citations omitted.) *Eastely v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶8} "In order to prove medical malpractice, the plaintiff has the burden to prove, by a preponderance of the evidence, that the defendant breached the standard of care owed to the plaintiff and that the breach proximately caused an injury." *Segedy v. Cardiothoracic & Vascular Surgery of Akron, Inc.*, 182 Ohio App.3d 768, 2009-Ohio-2460, ¶ 11 (9th Dist.). "A medical-malpractice claim requires the plaintiff to prove causation through medical expert testimony in terms of probability to establish that the injury was, more likely than not, caused by the defendant's negligence." (Internal quotations and citations omitted.) *Id.*

{¶9} In her merit brief, Ms. Hayward asserts that there was no evidence presented at trial that Ms. Hayward's injury resulted from anything other than improper placement of the retractor blade. Thus, the crux of Ms. Hayward's manifest weight argument is that she put on evidence of negligence that was not rebutted by the defendants and, therefore, the verdict is necessarily inconsistent with the totality of the unrebutted evidence.[2]

{¶10} Ms. Hayward presented evidence, which, if believed, supported her claim that Drs. Cullado and Wanek negligently placed the retractor which compressed Ms. Hayward's psoas muscle through which the femoral nerve runs. The compression led to the nerve receiving inadequate blood flow (ischemia) which in turn resulted in the neuropathy. Thus, under Ms. Hayward's theory, had the surgeons properly placed the retractor, she would not have been injured.

---

[2] The parties seem to be in agreement that, if Dr. Cullado was negligent, then the remaining parties are liable as well.

{¶11} The testimony was undisputed that the Bookwalter retractor is commonly used in performing open abdominal and pelvic surgeries. Ms. Hayward's expert, Dr. William Irvin, M.D., a board-certified physician in obstetrics and gynecology and gynecologic oncology, stated that it is a preferred retractor due to the "excellent intraabdominal exposure" it provides for surgeons. Dr. Irvin testified that he performs 150-180 major surgical procedures in a year and that he uses a Bookwalter retractor in virtually every abdominal surgery he performs.

{¶12} Dr. Irvin published a peer-reviewed article on minimizing neurologic injury during gynecologic surgery. He testified that he believed that Ms. Hayward's injury was caused by "compression of the femoral nerve with a lateral retractor blade." He additionally testified that it was his opinion that "the compression of the psoas muscle by inappropriately placing the lateral retractor blade basically compressed the nerve within which subsequently gave rise to the dysfunction that [Ms. Hayward] has now three years after the surgical procedure." He indicated that "[i]f you're not careful in placing the lateral retractor blades the blade can go deep enough into the pelvis that when you pull it laterally to get your exposure, you're digging into this psoas muscle," which then ultimately leads to compression of the femoral nerve. The length of time the nerve is compressed determines whether the injury will be temporary or permanent. He opined that, in Ms. Hayward's case, the surgeons

> did fall below the accepted standards of care because that form of injury from retractor blade placement can be completely avoided by simply placing the retractor blades appropriately, by being aware of the mechanism of the injury, knowing that compressing the psoas muscle will cause injury to the nerve and by checking the placement of the blades once they are in position to make sure that the tip of the blade that goes into the abdomen, that the lowest part of the blade is above the psoas muscle. You feel for a space with your hand between the bottom of the blade and the top of the psoas muscle. And if the blade is above the psoas muscle it's absolutely impossible for that blade to compress the psoas muscle in the nerve in it and cause retractor blade associated neuropathy.

{¶13} While he also testified there were other events that could cause a femoral nerve neuropathy, such as a hematoma, an abscess, and diabetes, there was no evidence that Ms. Hayward had any of those conditions. In addition, the nerve was not cut. Dr. Irvin further testified that, because Ms. Hayward was positioned in the modified lithotomy position for the surgery, stretching of the femoral nerve would not have happened as it cannot happen in that position. Thus, Dr. Irvin testified that, "[b]y process of exclusion * * * [a]nd in the absence of a hematoma or abscess * * * there really is no other underlying mechanism by which [the injury] could have occurred[]" other than by inappropriate placement of the retractor blades. Thus, he concluded that Ms. Hayward's injury was caused by the negligence of Drs. Cullado and Wanek.

{¶14} Ms. Hayward also offered evidence of the consulting neurologist, Dr. Lada, who examined her after she experienced the weakness and loss of sensation in her left leg following the surgery. After ruling out other potential causes, Dr. Lada opined that Ms. Hayward's injury occurred during the surgery and was due to a period of prolonged compression of the nerve. He concluded that her nerve injury was most likely secondary to a retractor injury. Likewise, Exhibit 9, Ms. Hayward's discharge summary was admitted at trial and stated that Ms. Hayward's nerve injury was likely secondary to a retractor injury. Specifically, the summary stated that Ms. Hayward "most probably suffered a femoral neuropathy likely secondary to a retractor injury." The discharge summary was dictated by Dr. Wanek and signed by Dr. Cullado.

{¶15} Dr. Cullado, who performed Ms. Hayward's surgery and who is board certified in both general surgery and colorectal surgery, testified that he performs over 100 abdominal surgeries a year and uses a Bookwalter retractor during most of them. Dr. Cullado proceeded to discuss and demonstrate in detail how to use and properly place a Bookwalter retractor. Dr. Cullado testified that, while the detailed description he provided for the jury was not in his

operative note, he stated that it would not typically be. This notion was confirmed by the Defendants' expert, Dr. Muscarella.

{¶16} Dr. Cullado agreed that Ms. Hayward developed a femoral neuropathy. When he was confronted with the discharge summary, Dr. Cullado testified that, "[w]hen we went through the whole process and the entire workup and the data that we had to bear at that point in time, our collective conclusion was that [the injury] was most likely correlated with the use of the retractor." In addition, Dr. Cullado testified that "if you improperly place the retractors you're increasing the risks of an injury and the manner in which you improperly place them would relatively increase or decrease the risk of the injury." He agreed that Ms. Hayward did not consent to an improper placement of the retractors. Dr. Cullado acknowledged that the inflammation present due to Ms. Hayward's diverticulitis, as well as the fact that Ms. Hayward had a thin abdominal wall increased the risks associated with using a retractor. Moreover, he testified that he did not believe that positioning of Ms. Hayward's body during surgery, referred to as a modified lithotomy position, caused her nerve injury. Dr. Cullado testified that he did not directly compress the psoas muscle with the retractor. He stated that "[t]hat's wrong practice. * * * [T]here's not a reason to do it any way. It's not even where you're operating. * * * [There] is no reason to be that deep." He further agreed that he checks the blades of the retractor to make sure they are not that deep and that the blades are frequently adjusted and replaced during surgery to ensure they are in the proper position. When specifically asked about Ms. Hayward's surgery, Dr. Cullado stated that the blades were not deep enough that they would have compressed the muscle, and, in addition, he testified that he used the shallowest blades to minimize the risk. He testified that he checked the blades to ensure that they were not impinging on Ms. Hayward's psoas muscle. When confronted with Dr. Irvin's article on minimizing the

risk of neurologic injury, he stated that he complied with each suggestion made in the article. Dr. Cullado stated that he did not commit malpractice and asserted that he met the standard of care. And while he testified that he believed that Ms. Hayward's injury was associated with the use of the retractor, he likewise stated that he did not directly compress the muscle with the retractor. He agreed that it never meets the standard of care to be careless and asserted that he was not careless during Ms. Hayward's surgery.

{¶17} Dr. Wanek only testified on cross-examination. He testified that he dictated the discharge summary which concluded that Ms. Hayward "most probably suffered a femoral neuropathy likely secondary to a retractor injury[.]" He agreed that the consulting neurologist concluded that Ms. Hayward developed a femoral neuropathy. He indicated he was aware of the risk of injury to the femoral nerve if the retractor was improperly placed at the time he assisted in the surgery. Moreover, he agreed that the neuropathy was not caused by diabetes, a hematoma, or cutting or suturing the nerve. He further agreed that there was no evidence that Ms. Hayward was improperly positioned during the surgery.

{¶18} Dr. Peter Muscarella, M.D., a gastrointestinal surgeon, testified as the Defendants' expert. He testified that he performs around three to four hundred abdominal surgeries per year and that he almost always uses a Bookwalter retractor when performing open abdominal surgery. Dr. Muscarella described the risks of surgical procedures as "adverse events that can occur when you do an operation. And usually these are things that are discussed with the patient at the time you obtain consent * * *." He stated that there are "things that we hope don't occur but we know to some extent these things can happen as a risk of performing a procedure." He described a complication as "when an adverse outcome actually does occur for a

patient." Dr. Muscarella agreed that complications can happen in surgery even when all applicable standards of care are met by the surgeon.

{¶19} Dr. Muscarella opined that Ms. Hayward's injury occurred as a result of a complication from surgery. He stated that "[t]he procedure was performed, as far as [he could] tell, within the standard of care. [He] reviewed the operative report. And in looking at some of the things the surgeon did, * * * it seems as though this surgeon is a careful surgeon." Dr. Muscarella proceeded to provide examples of things the surgeons did in the operating room to minimize risks to Ms. Hayward. He testified that he was "confident that this surgeon * * * carefully placed the retractor when he did the operation because everything else that he did during the operation was careful and thoughtful with the aim of minimizing complications for the patient." He indicated that "femoral neuropathy is probably * * * the most common nerve that can be injured during this type of operation." He went on to note that,

> although there is literature that shows that if you do carelessly place the retractor it can cause nerve injury, there's no literature that would suggest even with careful placement of the retractor that will completely eliminate the possibility of having nerve injury.
>
> In fact, there are some studies in the literature that say that even if you don't use the retractor at all you still can have nerve injuries that occur with these types of operations.

{¶20} Dr. Muscarella indicated that "of course, this was an unfortunate complication for this patient to have, but it is one that is well described for this type of procedure. And although the risks can be minimized by doing certain things, [in his opinion,] the risks [could not] be completely eliminated." He stated that "just doing the very operation [he] believe[s] that sometimes * * * a constellation of factors can come together that can result in a stretch of the nerve or ischemia * * * that is unavoidable regardless of what the surgeon does to try to minimize the risks." Thus, he testified that "just because there is a nerve injury does not in and

of itself mean that there was a careless placement of the retractor." Dr. Muscarella stated "there is no indication that there was anything careless or reckless or unsafe about what this surgeon did[]" and concluded that Dr. Cullado met the standard of care.

{¶21} Upon cross-examination, Dr. Muscarella agreed that a surgeon's negligence is not an acceptable risk or complication from surgery and that informed consent does not include consent to a surgeon's negligence. And while Dr. Muscarella admitted to being unaware that Drs. Lada and Cullado testified that Ms. Hayward's injury occurred as result of the retractor blades, Dr. Muscarella never retracted his conclusion that the standard of care was met and Dr. Cullado was not negligent. He continued to maintain that "there is no evidence in this case that [Dr. Cullado] carelessly placed the retractor." He opined that "the development of a complication like this many times can occur because of the complex constellation of events that are occurring, the type of operation, the way the patient was positioned, the use of the retractor, regardless of whether it was careless or careful." Moreover, Dr. Muscarella disagreed with Dr. Irvin's testimony that this injury could never result from positioning the patient in the modified lithotomy position. He stated that "the fact that [Ms. Hayward] was in a modified lithotomy position would predispose her to having a femoral nerve injury. It would increase the risk of that." Dr. Muscarella admitted that he did not know for sure the exact mechanisms that occurred to cause Ms. Hayward's injury. He stated that "[t]he placement of the retractor itself is known to increase the incidents of femoral injury, but that doesn't necessarily mean it was carelessly or inappropriately placed. Operations where you don't even use the retractor can result in femoral nerve injury."

{¶22} On redirect, Dr. Muscarella averred that "everything here * * * shows that this was a careful surgeon that did not negligently place the retractor. * * * [T]here's no evidence to

think that this occurred because of negligence." He further testified that he believed that, even if surgeons were to place the retractor in a textbook manner, there would still be a risk of femoral nerve injury. He remained confident that Ms. Hayward was injured as a result of a surgical complication that was not due to negligence. Dr. Muscarella noted on re-cross-examination that one study indicated a 7.5 percent incidence of femoral neuropathy when a self-retaining retractor was used and a .07 percent incidence of femoral neuropathy where no self-retaining retractor was used. Accordingly, femoral neuropathy could occur even when a self-retaining retractor was not used. Moreover, he indicated that, with respect to the patients in the study that suffered a femoral neuropathy despite the fact that a self-retaining retractor was not used, he did not think all those cases were caused by hematomas. Instead he imagined "other factors" caused those femoral neuropathies. Despite this, Dr. Muscarella acknowledged that it was possible to eliminate femoral nerve injuries caused by retractor blades.

{¶23} In summary, Ms. Hayward presented evidence that Drs. Cullado and Wanek breached the standard of care by improperly placing the retractor and as a result of such improper placement, she suffered nerve damage. Dr. Irvin opined that it was impossible for Ms. Hayward to have sustained the injury from anything but the compression of an improperly placed retractor blade. By contrast, the Appellees presented evidence that Drs. Cullado and Wanek followed appropriate procedures with respect to the placement of the retractor and that Dr. Cullado checked the retractor blades to make sure that they were not compressing the psoas muscle. In addition, by way of Dr. Muscarella, Appellees offered evidence that the doctors did not breach their duty of care in placing the retractor and that even careful placement of the retractor cannot completely eliminate the risk of femoral neuropathy. Dr. Muscarella affirmatively testified that he believed that Dr. Cullado was not negligent, that he was careful, and that he met the standard

of care with respect to the placement and use of the retractor. Thus, contrary to Ms. Hayward's argument that there was no evidence to contradict the evidence of negligence, there was evidence by which a jury could reasonably conclude that there was no breach of duty. *See Segedy*, 182 Ohio App.3d 768, 2009-Ohio-2460, at ¶ 11 (Emphasis added.) ("In order to prove medical malpractice, the plaintiff has the burden to prove, by a preponderance of the evidence, that the defendant breached the standard of care owed to the plaintiff *and* that the breach proximately caused an injury.").

**{¶24}** In this regard, we note that the jury had to evaluate, weigh the physical and testimonial evidence, and judge the credibility of the witnesses. In particular, the jury had to assess Dr. Irvin's opinions as against the testimony of Drs. Cullado and Muscarella. Although Dr. Cullado signed the discharge summary indicating his acknowledgement that the injury was likely secondary to a retractor injury, he nonetheless averred that he followed the proper standard of care with respect to the use of the retractor. Dr. Muscarella opined that it was still possible to suffer nerve damage and complications even with careful use of the retractor. Moreover, Dr. Muscarella's testimony indicates that the use of a self-retaining retractor, in and of itself, increases the risk of a femoral nerve injury. There was evidence that nerve injuries, and in particular femoral nerve injuries, are known complications of this type of surgery. Dr. Muscarella specifically testified that complications can occur without the negligence of the surgeons and testified that he believed that Ms. Hayward's injury was a complication of the surgery. Dr. Muscarella also provided testimony that the positioning of Ms. Hayward during the surgery may have also put her at risk for a nerve injury. Finally, despite vigorous cross-examination, Dr. Muscarella remained firm in his position that Dr. Cullado was not negligent.

{¶25} Ms. Hayward's contention was that the surgeons failed to meet the standard of care because they negligently placed the retractor causing a compression of the femoral nerve which injured Ms. Hayward. There is no dispute that an inappropriate placement of the retractor would violate the standard of care. Whether the retractor was negligently placed, however, was not uncontroverted. Neither Dr. Cullado nor Dr. Wanek admitted to negligently placing the retractor, despite acknowledging that Ms. Hayward's injury was likely correlated with the use of the retractor. Dr. Cullado demonstrated for the jury the use of a retractor. Dr. Muscarella testified that he saw no evidence indicating that the surgeons negligently placed the retractor.

{¶26} Ms. Hayward claims that Dr. Cullado's testimony "must be untrue, based upon the physical fact that the femoral nerve was compressed by the retractor blade." While the evidence could support the conclusion that Ms. Hayward's neuropathy was caused by compression of the nerve due to improper placement of the retractor blades, the evidence itself speaks in terms of probabilities and likelihoods. And while Ms. Hayward essentially equates Dr. Cullado's signature on the discharge summary and his agreement with its contents with an admission of negligence, the discharge summary reads as a statement of what the neurology consult ultimately revealed, not as an admission of wrongdoing. The summary stated that a "[n]eurology consult was obtained and it was finally completed [sic] that she most probably suffered a femoral neuropathy likely secondary to a retractor injury." Dr. Cullado remained firm in his testimony that he met the standard of care in terms of placement and management of the retractor, and it was Dr. Muscarella's opinion that Dr. Cullado met the standard of care. If both Dr. Cullado's and Dr. Muscarella's testimony was accepted as true by the jury, it could reasonably conclude that Ms. Hayward was injured due to a complication and not due to Dr. Cullado's negligence. We are mindful that the jury had the opportunity to observe the witnesses'

demeanor as they testified and to evaluate their credibility. In this case, given all of the evidence adduced at trial, we cannot say that the jury's credibility determinations were unreasonable.

**{¶27}** Thus, upon thorough review of the record, we cannot say that there was no evidence offered which contradicted Ms. Hayward's negligence claim, nor can we conclude that the verdict in this case amounts to a manifest miscarriage of justice. Accordingly, we overrule Ms. Hayward's first assignment of error.

ASSIGNMENT OF ERROR IV

THE COURT SHOULD HAVE GRANTED APPELLANT'S MOTION FOR A NEW TRIAL.

**{¶28}** Ms. Hayward asserts in her fourth assignment of error that the trial court erred in failing to grant her motion for new trial. We disagree.

**{¶29}** Ms. Hayward moved for a new trial based upon Civ.R. 59(A)(6), which provides that "[a] new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds: * * * [t]he judgment is not sustained by the weight of the evidence[.]"

> When considering a Civ.R. 59(A)(6) motion for a new trial, a trial court must weigh the evidence and pass on the credibility of the witnesses. [Yet], the trial court assesses the weight and credibility in a more limited sense than would a jury; the court is to determine, in light of its broad discretion, whether a manifest injustice has occurred. The job of the appellate court is to review whether the trial court abused its discretion in making this determination. Absent some indication that the trial court was unreasonable, arbitrary or unconscionable in exercising its discretion, the judgment of the trial court will not be disturbed.

(Internal quotations and citations omitted.) *Schottenstein, Zox & Dunn Co., L.P.A. v. Reineke*, 9th Dist. Medina No. 10CA0138-M, 2011-Ohio-6201, ¶ 11. Given our own conclusion that the jury's verdict was not against the manifest weight of the evidence, we cannot say that the trial court abused its discretion in denying Ms. Hayward's motion for a new trial based upon a

contention that the verdict was against the manifest weight of the evidence. Ms. Hayward's fourth assignment of error is overruled.

ASSIGNMENT OF ERROR II

THE COURT ERRED IN ALLOWING THE ADMISSION OF, AND ARGUMENT CONCERNING, CONSENT FORMS.

**{¶30}** Ms. Hayward argues in her second assignment of error that the trial court erred in allowing argument and testimony concerning the surgery consent form and in the admission of the form. We do not agree.

**{¶31}** Generally, "we review a trial court's admission of evidence for abuse of discretion." *State v. Truitt*, 9th Dist. No. 25527, 2011-Ohio-6599, ¶ 30. Evid.R. 103(A)(1) provides that "[e]rror may not be predicated upon a ruling which admits * * *evidence unless a substantial right of the party is affected, and * * * a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context[.]" Evid.R. 103(D) states that "[n]othing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court." Ms. Hayward's counsel did not object at any point in time concerning the discussion, use, or admission of the consent form. Thus, this Court is limited to a review for plain error.

> The Supreme Court had noted that in civil cases, the application of the plain error doctrine is not favored:
>
> Although in criminal cases '[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court,' Crim.R. 52(B), no analogous provision exists in the Rules of Civil Procedure. The plain error doctrine originated as a criminal law concept. In applying the doctrine of plain error in a civil case, reviewing courts must proceed with the utmost caution, limiting the doctrine strictly to those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material adverse effect on the character of, and public confidence in, judicial proceedings.

The Court reaffirmed its position that the doctrine is sharply limited to the extremely rare case involving exceptional circumstances where the error, left unobjected to at the trial court, rises to the level of challenging the legitimacy of the underlying judicial process itself. Thus, [t]he plain error doctrine should never be applied to reverse a civil judgment simply because a reviewing court disagrees with the result obtained in the trial court, or to allow litigation of issues which could easily have been raised and determined in the initial trial.

(Emphasis omitted.) (Internal quotations and citations omitted.) *Dragway 42, L.L.C. v. Kokosing Constr. Co., Inc.*, 9th Dist. Wayne No. 09CA0073, 2010-Ohio-4657, ¶ 27.

**{¶32}** We note that Ms. Hayward's counsel affirmatively stated that he had no objections to admission of the consent form. Thus, Ms. Hayward has forfeited the issue concerning admission of the form itself for purposes of appeal. *See State v. Feliciano*, 9th Dist. Lorain No. 09CA009595, 2010-Ohio-2809, ¶ 6. Further, a copy of the consent form is part of Ms. Hayward's medical records from Dr. Cullado's office, which were also admitted without objection.

**{¶33}** With respect to the substantive argument and testimony concerning the consent form, it appears, based on Ms. Hayward's brief on appeal, that she is only concerned with Dr. Muscarella's testimony concerning the consent form, despite the fact that it is discussed by other witnesses during trial. We note that Ms. Hayward's counsel cross-examined Dr. Muscarella on the limits of a consent form and Dr. Muscarella acknowledged that a consent form does not authorize a physician to commit negligence nor does a consent form mean that a patient is consenting to negligence. Thus, in light of both counsel's express acquiescence to the admission of the actual consent form and Ms. Hayward's counsel's cross-examination of Dr. Muscarella, even assuming the argument and testimony were not admissible, we cannot see how the error rises to the level of plain error in light of its narrow application in civil cases. *See Dragway 42, L.L.C.* at ¶ 27. Accordingly, we overrule Ms. Hayward's second assignment of error.

III.

**{¶34}** In light of the foregoing, we overrule Ms. Hayward's assignments of error and affirm the judgment of the Summit County Court of Common Pleas.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

EVE V. BELFANCE
FOR THE COURT

WHITMORE, J.
MOORE, J.
CONCUR.

APPEARANCES:

JACK MORRISON, JR., THOMAS R. HOULIHAN, and VICKI L. DESANTIS, Attorneys at Law, for Appellant.

DOUGLAS G. LEAK, Attorney at Law, for Appellees.

MICHAEL J. HUDAK and BETTY DAVIS, Attorneys at Law, for Appellees.