[Cite as *Scott v. McCluskey*, 2018-Ohio-571.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

JACQUELYN L. SCOTT

    Appellant

    v.

DENNIS C. MCCLUSKEY, et al.

    Appellees

C.A. No.     27874

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CV-2009-07-4941

DECISION AND JOURNAL ENTRY

Dated: February 14, 2018

SCHAFER, Judge.

**{¶1}** Appellant Jacquelyn L. Scott, individually, and as the executrix of the estate of Roger W. Scott (the estate), appeals the judgments of the Summit County Court of Common Pleas finding in favor of Appellees Brenda Hensley-Buis, D.O.[1] and Dennis C. McCluskey, M.D. & Associates, Inc. ("McCluskey, M.D. & Associates"). This Court affirms.

I.

**{¶2}** On January 28, 2004, Mr. Scott, who at the time was 60 years old, presented to his doctor's office, McCluskey, M.D. & Associates, after experiencing intermittent burning chest pain upon inhalation over the previous two to three weeks which became worse with upper body exertion and became better with rest. At the time of the visit, Mr. Scott was not experiencing active chest pain. Mr. Scott had a cardiac catheterization in 1996. He was overweight and was

---

[1] The record reflects that Dr. Hensley-Buis was also referred to as Dr. Hensley and Dr. Buis; however, at the time of trial, she went by Dr. Hensley-Buis. This Court will herein refer to her as Dr. Hensley-Buis.

on medication for high blood pressure and high cholesterol. He was seen by a certified nurse practitioner, Erin Wolf.[2] Dr. Hensley-Buis oversaw Ms. Wolf's work on the date of Mr. Scott's visit. After Ms. Wolf assessed Mr. Scott, she recommended that he see a cardiologist for a catheterization. Mr. Scott was then sent home. An appointment with a cardiologist was ultimately scheduled for February 2, 2004. On January 30, 2004, Mr. Scott died from a heart attack.

{¶3} The instant matter is a re-filed action. We previously summarized the case's early history:

> [I]n the original complaint the estate sued [McCluskey, M.D. & Associates] asserting vicarious liability claims for the negligence of its employees and/or agents, including nurses and John/Jane Doe doctors. On the two-year anniversary of Mr. Scott's death, the estate moved for leave to amend the complaint instanter and attached an amended complaint naming Dr. Hensley[-Buis] as Jane Doe #4, asserting medical malpractice and wrongful death claims against her. The trial court ruled that the amended complaint was not timely filed and granted summary judgment to Dr. Hensley[-Buis] on both claims. After that, the estate voluntarily dismissed its claims.
>
> [In July 2009, w]hen it refiled this action under the savings clause, the estate named as defendants [McCluskey, M.D. & Associates] and Dr. Hensley[-Buis]. It asserted wrongful death and medical malpractice claims[3] against both defendants, alleging that "[s]aid [d]efendants, including their employees and/or agents, were negligent in providing medical care and treatment to decedent, Roger Scott[.]" * * *
>
> Both defendants moved for summary judgment on both claims. On August 13, 2010, the trial court granted summary judgment to Dr. Hensley[-Buis] on both claims because it determined that the estate had failed to commence its action against her within either the one-year medical malpractice statute of limitations or the two-year wrongful death statute of limitations. The estate did not immediately appeal that judgment. In the August 13 entry, the trial court also denied [McCluskey, M.D. & Associates'] motion for summary judgment[.] * * *.

_____

[2] The record reflects that Erin Wolf was formerly known as Erin Peter-Wolf and Erin Peter. However, as at the time of trial, she was known as Erin Wolf, we will refer to her by that name.

[3] In addition, Jacquelyn Scott, Mr. Scott's wife, as an individual, asserted a claim for loss of consortium.

* * * [In response to a motion for reconsideration, t]he trial court [] wrote * * * that the estate was permitted to proceed against [McCluskey, M.D. & Associates] based only on the conduct of the nurse, rather than that of the doctor. Following trial on that limited basis, the jury rendered a verdict for [McCluskey, M.D. & Associates], and the estate appealed. On appeal, the estate [] abandoned its arguments in regard to the medical malpractice claims against Dr. Hensley[-Buis] and [McCluskey, M.D. & Associates], focusing its arguments on the wrongful death claims against both defendants.

*Scott v. McCluskey, M.D. & Assocs., Inc.*, 9th Dist. Summit 25838, 2012-Ohio-2484, ¶ 2-5.

**{¶4}** This Court affirmed in part, and reversed in part. *Id.* at ¶ 1. We concluded that the trial court incorrectly granted summary judgment to Dr. Hensley-Buis on the wrongful death claim. *Id.* at ¶ 29. Thus, we also determined that the "trial court incorrectly limited the estate's theories of liability against [McCluskey, M.D. & Associates] at trial because it incorrectly granted Dr. Hensley[-Buis] summary judgment on the wrongful death claim." *Id.* at ¶ 31. We thereafter remanded the matter for a retrial. *See id.* at ¶ 33-34.

**{¶5}** Following our remand, the matter again proceeded to trial. After which, the jury found that Dr. Hensley-Buis and Ms. Wolf breached the standard of care; however, the jury also concluded that their breaches of the standard of care were not the proximate cause of Mr. Scott's death. Thereafter, the trial court entered judgment in favor of Dr. Hensley-Buis and McCluskey, M.D. & Associates and dismissed the estate's claims. The estate filed a motion for judgment notwithstanding the verdict ("JNOV") and a motion for a new trial. The estate maintained that the evidence only supported that Dr. Hensley-Buis' and Ms. Wolf's negligence proximately caused Mr. Scott's death. After the trial court denied the motions, the estate appealed, raising four assignments of error for our review. McCluskey, M.D. & Associates and Dr. Hensley-Buis have raised a cross-assignment of error.

II.

**ASSIGNMENT OF ERROR I**

**The trial court erred by failing to grant [the estate's] motion for judgment notwithstanding the verdict[.]**

{¶6} The estate asserts in its first assignment of error that the trial court erred by failing to grant its motion for JNOV. Specifically, the estate argues that Dr. Hensley-Buis and McCluskey, M.D. & Associates failed to rebut the estate's evidence concerning proximate cause.

{¶7} "After a court enters judgment on a jury's verdict, a party may file a motion for JNOV to have the judgment set aside on grounds other than the weight of the evidence." *Catalanotto v. Byrd,* 9th Dist. Summit No. 27302, 2015-Ohio-277, ¶ 8, citing Civ.R. 50(B). "'JNOV is proper if upon viewing the evidence in a light most favorable to the non-moving party and presuming any doubt to favor the nonmoving party reasonable minds could come to but one conclusion, that being in favor of the moving party.'" *Catalanotto* at ¶ 8, quoting *Williams v. Spitzer Auto World, Inc.*, 9th Dist. Lorain No. 07CA009098, 2008-Ohio-1467, ¶ 9. "Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon [a motion for JNOV]." *Jackovic v. Webb*, 9th Dist. Summit No. 26555, 2013-Ohio-2520, ¶ 15, quoting *Osler v. City of Lorain*, 28 Ohio St.3d 345, 347 (1986).

{¶8} "In order to prove medical malpractice, the plaintiff has the burden to prove, by a preponderance of the evidence, that the defendant breached the standard of care owed to the plaintiff and that the breach proximately caused an injury." *Segedy v. Cardiothoracic & Vascular Surgery of Akron, Inc.*, 182 Ohio App.3d 768, 2009-Ohio-2460, ¶ 11 (9th Dist.). "A medical malpractice claim requires the plaintiff to 'prove causation through medical expert testimony in terms of probability to establish that the injury was, more likely than not, caused by the defendant's negligence.'" *Id.*, quoting *Roberts v. Ohio Permanente Med. Group, Inc.*, 76

Ohio St.3d 483, 485 (1996). Thus, "[i]n order to prove [its] wrongful-death claim based on medical negligence, [the estate] had the burden to prove, by a preponderance of the evidence, that [there was a] deviat[ion] from the applicable standard of care in treating [Mr. Scott] and that the deviation more likely than not caused [his] death.[4]" *Segedy* at ¶ 11. "The trier of fact 'may not disregard credible and uncontradicted expert testimony[.]'" *Cromer v. Children's Hosp. Med. Ctr. of Akron,* 9th Dist. Summit No. 25632, 2016-Ohio-7461, ¶ 26, quoting *State v. White,* 118 Ohio St.3d 12, 2008-Ohio-1623, ¶ 74.

{¶9} In the instant matter, much of the testimony at trial focused on whether Dr. Hensley-Buis and Ms. Wolf breached the standard of care and whether Mr. Scott's symptoms were characteristic of atypical chest pain or acute coronary syndrome. Via interrogatories, the jury found that Dr. Hensley-Buis breached the standard of care by not examining Mr. Scott, by not sending him directly to the emergency room, and by not following up on her recommendation. The jury also found that Ms. Wolf breached the standard of care by performing an incomplete exam on Mr. Scott, by not keeping complete records, and by not following the recommendation of Dr. Hensley-Buis. However, the jury also found that the breaches by Dr. Hensley-Buis and Ms. Wolf did not proximately cause Mr. Scott's death. Thus, verdicts were entered in favor of Dr. Hensley-Buis and McCluskey, M.D. & Associates.[5] On appeal, the estate maintains that Dr. Hensley-Buis and McCluskey, M.D. & Associates failed to present sufficient evidence to rebut the estate's testimony concerning proximate cause.

---

[4] We note that the only claims before the jury were the wrongful death claims. In the first appeal, the estate abandoned its arguments related to the medical malpractice claims. *See Scott*, 2012-Ohio-2484, at ¶ 5.

[5] We note that while some of the verdict forms list Ms. Wolf as a Defendant in this matter, she was never made a party. Instead, McCluskey, M.D. & Associates was the Defendant that the estate attempted to hold liable for Ms. Wolf's negligence.

{¶10} On January 28, 2004, Mr. Scott, who was 60 years old at the time, phoned McCluskey, M.D. & Associates to make an appointment to address chest pain he had been experiencing. While he was offered an earlier appointment, he turned it down and opted to wait until that evening when his wife, Jacquelyn Scott could accompany him. After having dinner at a local restaurant, Mr. and Mrs. Scott went to the appointment.

{¶11} Mr. Scott was seen by a medical assistant and then Ms. Wolf, a certified nurse practitioner. Mr. Scott complained of burning midsternal chest pain with inhalation that radiated to his back, became worse with an upper body workout, and decreased with rest. He denied chest pain when using his exercise bicycle, but stated that he would have pain if he worked his arms while on the bicycle. He indicated that he had been experiencing the chest pain on and off for two to three weeks. However, Mr. Scott was not experiencing chest pain at the time of the office visit. Mr. Scott generally denied any shortness of breath, but would sometimes awaken with shortness of breath.

{¶12} Mr. Scott's history was significant for sleep apnea, high blood pressure, and high cholesterol, which was being managed by medications, as well as a prior heart catheterization in 1996 which revealed blockages in his coronary arteries. Additionally, Mr. Scott was overweight, weighing 302 pounds. These factors, along with Mr. Scott's age and sex were known risk factors for heart disease. Mr. Scott's blood pressure was mildly elevated at the time of the appointment with a reading of 140/90. Further, Ms. Wolf detected edema and a new onset heart murmur.

{¶13} Ms. Wolf ordered an EKG, which indicated that Mr. Scott had sinus bradycardia, or a slightly slower than normal heart rate, but Ms. Wolf testified that the EKG was otherwise normal. She did acknowledge that when she later looked at the EKG after the appointment she

noticed that there was a small ST elevation, but believed that the EKG could still be considered normal. Because the nature of Mr. Scott's chest pain was somewhat unclear to her, Ms. Wolf then discussed the case with Dr. Hensley-Buis, who was the supervising physician that day. Dr. Hensley-Buis agreed with Ms. Wolf's assessment and did not see any acute change on the EKG that would indicate he was having a heart attack; however, she did not examine Mr. Scott. Ms. Wolf concluded that Mr. Scott was suffering from atypical chest pain and that he should be referred to a cardiologist for a cardiac catheterization. Additionally, Mr. Scott was prescribed aspirin and a diuretic.

{¶14} Dr. Hensley-Buis' testimony about what her recommendations were that night was somewhat confusing. Initially she testified that she "recommended he should be in the emergency room to get a workup." She also agreed that she had recommended to Ms. Wolf that the quickest way for Mr. Scott "to get worked up" was to send him to the emergency room. Dr. Hensley-Buis acknowledged that Ms. Wolf did not follow that recommendation and that failing to follow the recommendation of a supervising physician was a violation of the standard of care. Nonetheless, Dr. Hensley-Buis testified that she did not believe that, overall, Ms. Wolf failed to meet the standard of care in treating Mr. Scott. When later asked about her recommendations, she clarified that if Mr. Scott wanted a quicker workup, he should go to the emergency room but that she did not tell Ms. Wolf that she needed to send Mr. Scott to the emergency room.

{¶15} Dr. Hensley-Buis testified that Ms. Wolf informed her later that evening that Mr. Scott was not going to the emergency room, and Dr. Hensley-Buis thereafter told Ms. Wolf that she had to talk to outpatient services the next day to get Mr. Scott in to see a cardiologist. According to Mrs. Scott, Mr. Scott was told that, if he had sustained chest pain, then he should go to the emergency room. The records also reflect that if Mr. Scott experienced sustained chest

pain, then he should go to the emergency room. Ultimately, Mr. Scott was scheduled to see a cardiologist Monday, February 2, 2004.

{¶16} On Friday, January 30, 2004, while at work, Mr. Scott was found unresponsive and was rushed to the hospital. Mr. Scott could not be resuscitated and was pronounced dead. No autopsy was performed, but the certificate of death listed his cause of death as acute myocardial infarction with asystole (heart attack) due to coronary artery disease. Mrs. Scott indicated that Mr. Scott had not complained of chest pain following his office visit, and he did not seek additional medical care prior to his death.

{¶17} The estate's experts' testimony focused on Mr. Scott's symptoms and how they could be an indication of acute coronary syndrome. Additionally, their testimony concluded that the standard of care required that Mr. Scott be sent to the emergency room for further observation and evaluation. Both parties' experts appeared to be in agreement that, if a patient was experiencing acute coronary syndrome, such condition was a situation that required immediate action and a trip to the emergency room.

{¶18} First, the estate put forth the expert testimony of Dr. Robert Sing, who was board certified in family medicine, sports medicine, and emergency medicine. Additionally, Dr. Sing was certified in forensic medicine. Dr. Sing testified that Ms. Wolf breached the standard of care by failing to document certain symptoms in the chart, including the nature of Mr. Scott's edema and the nature of the new onset heart murmur. Dr. Sing noted abnormalities on the EKG, namely, ST segment elevations which he indicated could signal silent ischemia, "where parts of the heart aren't quite getting as much oxygen as they should be * * *." Dr. Sing testified that Mr. Scott displayed many symptoms and findings that suggested that Mr. Scott might have acute coronary syndrome: midsternal chest pain upon inhalation, the abnormal EKG, edema, the prior

heart catheterization, and the new onset heart murmur. Dr. Sing described acute coronary syndrome as the evolution of a cholesterol problem in the arteries in which the arteries progressively get smaller due to the buildup of cholesterol. Once the narrowing reaches a critical level, physical activity leads to chest pain as the oxygen demands of the heart cannot be met. If the opening continues to narrow and closes off, blood flow stops and that part of the heart muscle dies, which is a heart attack. Dr. Sing believed that Mr. Scott began suffering from acute coronary syndrome as early as two weeks before the office visit and that he may have had a small heart attack at the time that was small enough that it would not show up on an EKG.

{¶19} Dr. Sing testified that he believed Dr. Hensley-Buis was negligent in failing to examine Mr. Scott. He averred that Dr. Hensley-Buis failed to rule out acute coronary syndrome and that Mr. Scott's symptoms warranted that he be sent to the emergency room. He opined that they both failed to meet the standard of care by failing to ensure that Mr. Scott was informed that he should go to the emergency room. He further testified that it was his belief that Dr. Hensley-Buis negligently supervised Ms. Wolf. Dr. Sing concluded that the combined negligence of Ms. Wolf and Dr. Hensley-Buis was the cause of Mr. Scott's death, and that, if Mr. Scott had been sent to the emergency room, he would have survived and would have had a near normal life expectancy. He agreed that, if Mr. Scott had been timely treated for acute coronary syndrome, a heart attack would have been prevented.

{¶20} The estate also presented the testimony of Dr. Charles Blatt, a cardiologist. Dr. Blatt testified that, based upon his review of Mr. Scott's chart and the depositions, Mr. Scott, at a minimum, "required further observation" and that that type of observation would take place at an emergency room. Dr. Blatt described acute coronary syndrome as "the beginning of a heart attack process." Dr. Blatt averred that more than likely Mr. Scott was in the beginning stages of

acute coronary syndrome at the time of his appointment. Dr. Blatt opined that both Ms. Wolf and Dr. Hensley-Buis fell below the standard of care in their treatment of Mr. Scott. Dr. Blatt asserted that, if Mr. Scott had gone to the emergency room, Dr. Blatt would assume that

> [he] would have been observed for at least 24 hours with a series of electrocardiograms performed and a series of blood tests, which would include cardiac enzyme tests over that period, and a careful assessment of * * * the development and course of his symptoms.

> If the enzymes were negative, that meaning no acute heart problem, [Dr. Blatt] would expect that he would have undergone a stress test, possibly with imaging, which would further clarify whether he had significant provocable low blood flow or ischemia to his heart and muscle, and that would have been really a * * * standard approach before allowing him to go home.

> If he developed a leakage of enzymes or if he developed more prominent clear-cut ST segment elevation, then he would have gone immediately to a cardiac catheterization laboratory.

{¶21} Dr. Blatt then concluded that, had Mr. Scott been sent to the emergency room on January 28, 2004, he more than likely would have survived and would have had a near normal life expectancy. Dr. Blatt admitted that he could not say for certain what killed Mr. Scott as no autopsy was performed; however, he believed more likely than not that he died from an acute myocardial infarction, as listed on the death certificate. He additionally agreed that, even if Mr. Scott had gone to the emergency room and coronary disease requiring immediate treatment was discovered, the treatments, which could have included stents and bypass, carried their own mortality rate, which included a risk of death.

{¶22} Dr. Hensley-Buis' and McCluskey, M.D. & Associates' case focused on demonstrating that Mr. Scott's symptoms were consistent with atypical chest pain, and were not serious enough to indicate acute coronary syndrome, or to warrant sending him immediately to the emergency room.

{¶23} Ms. Wolf testified that the edema and heart murmur that Mr. Scott had at the time of the visit would not have been severe or high grade because, if they had been, she would have documented the same. While she agreed that there was a slight ST elevation on the EKG she did not think it was outside the realm of normal. She testified that Mr. Scott was not in distress at the time of the visit, and, if he had been experiencing chest pain during the visit, she would have sent him to the emergency room. Ms. Wolf indicated that Dr. Hensley-Buis did not recommend that Mr. Scott go to the emergency room; instead, Dr. Hensley-Buis suggested that he would get a quicker workup if he went to the emergency room that night.

{¶24} Dr. Hensley-Buis testified that she had a good relationship with Ms. Wolf and that she generally trusted her judgment. Dr. Hensley-Buis examined Mr. Scott's EKG and testified that she did not see any acute changes indicating a heart attack and did not think that Mr. Scott's constellation of symptoms pointed to him having acute coronary syndrome. She concluded that it was reasonable to have him see a cardiologist in a timely manner but that it was not necessary to go to the emergency room that night because he did not present as "emergent[.]" Additionally, she testified that she believed that she met the standard of care and when she was asked whether anything she did, or failed to do, caused Mr. Scott's death, she answered that it did not.

{¶25} Dr. Hensley-Buis and McCluskey, M.D. & Associates also presented three expert witnesses: Dr. Chad Braun, Dr. Steven Yakubov, and Dr. Raymond Rozman. Dr. Braun practiced family medicine and also directed a family medicine training program for residents. Dr. Braun testified that he believed that Dr. Hensley-Buis met the standard of care in her involvement with Mr. Scott's care. Dr. Braun testified that while a new onset heart murmur could be a sign of acute coronary syndrome, he believed that Mr. Scott's murmur was more

consistent with age-related changes. Dr. Braun also opined that Mr. Scott's edema was more likely related to his weight than to be connected to acute coronary syndrome. Dr. Braun approved of the plan to have Mr. Scott follow-up with a cardiologist in light of what Dr. Braun found to be an essentially normal EKG and under circumstances in which Mr. Scott was not experiencing chest pain in the office. He overall felt that "the assessment of atypical chest pain [was] appropriate[]" and that Mr. Scott did not have acute coronary syndrome. His differential diagnosis would include non-cardiac related conditions, including musculoskeletal pain.

{¶26} Dr. Yakubov, a cardiologist, testified that a patient has to have active, ongoing chest pain to have acute coronary syndrome. Thus, he did not believe that Mr. Scott had acute coronary syndrome and instead agreed with Ms. Wolf's assessment of atypical chest pain. He testified that he tended to think that Mr. Scott's chest pain was musculoskeletal because he experienced it when working his arms while on his exercise bicycle and not when he was using his bicycle without using his arms. Further, Mr. Scott's chest pain was not the typical chest pain of substernal pressure associated with a heart attack. Dr. Yakubov agreed that there was a slight ST elevation on Mr. Scott's EKG but described it as a nonspecific finding. Dr. Yakubov indicated that he would not see a reason to send Mr. Scott to the emergency room in light of his absence of chest pain during the visit and his EKG results, which did not indicate any acute changes. He testified that there is no way to determine who will have a heart attack; some patients with a 10% blockage with have a heart attack, while other patients with more significant blockages will not have a heart attack. Dr. Yakubov acknowledged that sometimes, the only presenting symptom of a heart attack is sudden cardiac death and that it is possible to have a heart attack with no pain. He opined that Ms. Wolf's workup met the standard of care and that the plan developed by Ms. Wolf and approved by Dr. Hensley-Buis also met the standard of

care. He indicated it would be appropriate to refer Mr. Scott to a cardiologist and for him to have a stress test about a week later which might then lead to a catheterization depending on the findings.

{¶27} Dr. Rozman, who was board certified in internal medicine and gastroenterology, testified that he believed that Ms. Wolf met the standard of care in her evaluation and management of Mr. Scott. Dr. Rozman also averred that Ms. Wolf's history and record keeping complied with the standard of care. Based upon those records, Dr. Rozman asserted that Mr. Scott's chest pain was more consistent with musculoskeletal pain as opposed to cardiac pain. Dr. Rozman agreed that Mr. Scott's chest pain appeared to be atypical chest pain and it was not the typical heaviness or pressure associated with cardiac chest pain. However, he could not say with medical certainty what caused Mr. Scott's chest pain but did not believe that it was acute coronary syndrome. Dr. Rozman averred that all of Mr. Scott's risk factors for coronary artery disease could not predict when he would suffer acute coronary syndrome or a heart attack. Dr. Rozman described Mr. Scott's EKG as being normal but having mild ST segment elevation, which he agreed was a nonspecific change that was a common finding, particularly in men. He averred that it was not necessary to send Mr. Scott to the emergency room. He indicated that if a patient is having acute coronary syndrome, active chest pain, or a heart attack, then the patient needs to be sent directly to the emergency room. Dr. Rozman opined, based upon a reasonable degree of medical probability and his understanding of the case, that Ms. Wolf met the standard of care and that "nothing that [Ms. Wolf] did or failed to do contributed to [Mr. Scott's] death."

{¶28} After reviewing all the evidence and considering it in a light most favorable to Dr. Hensley-Buis and McCluskey, M.D. & Associates, we conclude that the trial court did not err in denying the estate's motion for a JNOV. There was evidence presented from which a jury could

reasonably conclude that Dr. Hensley-Buis' and Ms. Wolf's breaches of the standard of care did not proximately cause Mr. Scott's death. Dr. Hensley-Buis specifically testified that she did not believe that her actions or inactions caused Mr. Scott's death. While Dr. Hensley-Buis was not called specifically as an expert, the estate did not object to her opinion testimony and has not challenged it on appeal. Additionally, Dr. Rozman expressly testified that nothing Ms. Wolf did or did not do caused Mr. Scott's death. The estate asserts that such testimony amounted to a discussion of standard of care, but we fail to see it as such. From Dr. Rozman's statement, one could infer that Ms. Wolf's failure to send Mr. Scott to the emergency room did not cause his death, leading to the conclusion that he could have died even if he had gone that night. Dr. Rozman's testimony included a discussion about whether Mr. Scott had acute coronary syndrome and whether he should have been sent to the emergency room. Dr. Hensley-Buis' and McCluskey, M.D. & Associates' experts were of the opinion that Mr. Scott did not have acute coronary syndrome at the time of the office visit and that his condition did not warrant an immediate trip to the emergency room. Despite the fact that it appears the jury concluded that Mr. Scott should have been told to go to the emergency room, and that it was a breach of the standard of care for him not to receive that recommendation, it is not clear whether the jury believed that Mr. Scott had acute coronary syndrome. While there was testimony that acute coronary syndrome is a process that ends in a heart attack, there was also testimony that atypical chest pain can be related to non-cardiac concerns. Further, while the record supports the conclusion that Mr. Scott died from an acute myocardial infarction (heart attack), the experts debated what precisely Mr. Scott was suffering from at the time of the office visit. *See Webb*, 2013-Ohio-2520 at ¶ 15, quoting *Osler*, 28 Ohio St.3d at 347 ("Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon [a

motion for JNOV].") Nonetheless, there was testimony that a heart attack can come on suddenly, sometimes with the only symptom being sudden cardiac death. Therefore, in light of the totality of the testimony, and in particular the testimony that nothing Dr. Hensley-Buis or Ms. Wolf did or did not do, caused Mr. Scott's death, we conclude there was sufficient evidence to create a question of fact for the jury as to whether Mr. Scott could have died even if he had been sent to the emergency room. Thus, a jury could conclude that Ms. Wolf's and Dr. Hensley-Buis' breaches of the standard of care did not proximately cause Mr. Scott's death.

**{¶29}** We overrule the estate's first assignment of error.

## ASSIGNMENT OF ERROR II

**The jury's verdict was not supported by the manifest weight of the evidence.**

**{¶30}** The estate argues in its second assignment of error that the jury's verdict was against the manifest weight of the evidence. The estate again focuses on the element of proximate cause and whether the weight of the evidence supports the conclusion that Ms. Wolf's and Dr. Hensley-Buis' breaches of the standard of care did not proximately cause Mr. Scott's death.

**{¶31}** "In assessing whether a jury's verdict is against the manifest weight of the evidence, this Court examines the entire record, "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the [verdict] must be reversed and a new trial ordered.'"" *Cromer,* 2016-Ohio-7461, at ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). "In other words, we review the verdict to determine whether the jury lost its way in concluding that 'the greater amount of credible evidence, offered in a

trial, [supported] one side of the issue rather than the other.'" *Cromer* at ¶ 12, quoting *Thompkins* at 387.

**{¶32}** "Because the jury was asked to complete special interrogatories pertaining to the determinative issues of negligence, causation, and damages, this Court's review of the weight of the evidence is 'confined to those determinative issues on which the jury rest[ed] its verdict and not on whether the evidence could support the same general verdict had the jury made other findings on the determinative issues.'" *Cromer* at ¶ 15, quoting *Seeley v. Rahe,* 3d Dist. Hancock No. 5-83-8, 1983 Ohio App. LEXIS 13014, *15 (Dec. 21, 1983).

**{¶33}** Above, we reviewed the testimony of the medical providers and experts in the case. We concluded that there was sufficient evidence from which a jury could reasonably conclude that Ms. Wolf's and Dr. Hensley-Buis' negligence did not proximately cause Mr. Scott's death. Notwithstanding, the estate argues that the weight of the evidence only supports the conclusion that Ms. Wolf's and Dr. Hensley-Buis' negligence did proximately cause Mr. Scott's death. While we agree with the estate that there was evidence from which the jury *could* have reasonably found that the providers' negligence did proximately cause Mr. Scott's death, we cannot conclude that the jury lost its way in failing to make that conclusion.

**{¶34}** While we have held that "[t]he trier of fact may not disregard credible and uncontradicted expert testimony[,]" we have also concluded that "the trier of fact may reject an expert's opinion based on the contradictory opinion testimony of another expert or the expert's own concessions during cross-examination that question the credibility of his opinion." (Internal quotations and citations omitted.) *Cromer* at ¶ 26. We likewise remain mindful that "'the trier of fact is in the best position to determine the credibility of witnesses and evaluate their testimony accordingly.'" *Trogdon v. Beltran,* 9th Dist. Lorain No. 15CA010809, 2016-Ohio-

5285, ¶ 42, quoting *State v. Tabassum,* 9th Dist. Summit No. 25568, 2011-Ohio-6790, ¶ 26. Under the circumstances before us, which included conflicting evidence on the issue of proximate cause, we cannot say that the jury lost its way. *See State v. Petrie*, 9th Dist. Summit No. 27490, 2016-Ohio-4941, ¶ 17 ("In other words, the evidence in this case is balanced, and in these circumstances, we cannot say that this is the exceptional case in which we must reverse the conviction as against the manifest weight of the evidence.")  While this Court may not have made the same determination in evaluating the element of proximate cause, we cannot say that the jury's verdict amounts to a manifest miscarriage of justice.

{¶35}  The estate's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

**The trial court erred by failing to grant [the estate's] motion for new trial.**

{¶36}  The estate argues in its third assignment of error that the trial court erred in failing to grant its motion for new trial.  Specifically, the estate asserts that it was entitled to a new trial because the verdict was against the manifest weight of the evidence based upon the proximate cause issue raised above.

{¶37}  When reviewing a motion for new trial based upon an argument that the judgment is not sustained by the weight of the evidence:

> a trial court must weigh the evidence and pass on the credibility of the witnesses. [Yet], the trial court assesses the weight and credibility in a more limited sense than would a jury; the court is to determine, in light of its broad discretion, whether a manifest injustice has occurred.  The job of the appellate court is to review whether the trial court abused its discretion in making this determination. Absent some indication that the trial court was unreasonable, arbitrary or unconscionable in exercising its discretion, the judgment of the trial court will not be disturbed.

*Hayward v. Summa Health Sys.,* 9th Dist. Summit No. 25938, 2015-Ohio-163, ¶ 29, quoting

*Schottenstein, Zox & Dunn Co., L.P.A. v. Reineke,* 9th Dist. Medina No. 10CA0138-M, 2011-

Ohio-6201, ¶ 11.

{¶38}  Here, the estate has not specifically developed an argument explaining how the

trial court abused its discretion.  *See* App.R. 16(A)(7).  Instead the estate has relied upon its

argument from the second assignment of error.  Given our disposition of that assignment of

error, and the limited argument made on appeal, we likewise overrule this assignment of error.

{¶39}  The estate's third assignment of error is overruled.

### ASSIGNMENT OF ERROR IV

**The trial court erred by dividing a jury interrogatory recommended by OJI
CV 417.17 into separate negligence and proximate cause interrogatories.**

{¶40}  The estate argues in its fourth assignment of error that the trial court erred by

having separate interrogatories for breach of the standard of care and proximate cause instead of

a single interrogatory detailing both concepts.

{¶41}  In the instant matter, the trial court had the following discussion with the parties

on the record:

> [Trial court]:  I do want to note for the record there are seven interrogatories.  The defense has requested narratives for both Dr. [Hensley-]Buis and Nurse Practitioner Wolf.  The Court has granted that request.  I believe I have no discretion.  They must be submitted.
>
> With that being said, [the Estate] provided the Court with the most recent jury instructions as it related to OJI to have a common interrogatory of a standard of care and proximate cause.  I find that that conflicts, especially with the most recent decision by the Supreme Court in *Muakkassa* entitling the defendant to narratives as it relates to the standard of care.
>
> So what this Court has done – the parties are more than welcome to put whatever objection on the record, but I have separated out standard of care and proximate cause, especially in light of those narratives, for each defendant on the standard of care issue.

[The estate's counsel], anything on that?

[The estate's counsel]: No, Your Honor.

[Trial court]: Okay. [Defendants' counsel]?

[Defendants' counsel]: No, Your Honor. Thank you.

[Trial court:] Okay. Any objections either side would like to note to the interrogatories?

[The estate's counsel]: I've read them half a dozen times now and I think they track, so no objection right now, but at the end we may have to fix something if it strikes any of us.

(Emphasis added.) During the remainder of the trial, the estate's counsel raised no issues about the interrogatories now being challenged.

{¶42} In light of the foregoing, we conclude that, at the very least, the estate has forfeited the ability to challenge this issue on appeal. In fact, the discussion can be read to indicate that the estate was withdrawing any objection to the interrogatories it may have had, as the estate's counsel affirmatively indicated that he had no objection to the interrogatories. Even assuming that the estate only forfeited (as opposed to waived) this argument, as the estate has not argued plain error on appeal, we decline to develop an argument on its behalf. *See Kucharek v. Tri-City Family Medicine, Inc.*, 148 Ohio App.3d 38, 40 (9th Dist.2001); *see also Wiegand v. Fabrizi Trucking & Paving, Co., Inc.*, 9th Dist. Medina No. 16CA0015-M, 2017-Ohio-363, ¶ 43. The estate's fourth assignment of error is overruled.

## CROSS-ASSIGNMENT OF ERROR

**The trial court erred in failing to grant a directed verdict in favor of Dennis C. McCluskey, M.D. & Associates, Inc. for the conduct of [Ms.] Wolf[.]**

{¶43} While McCluskey, M.D. & Associates also have a raised a cross-assignment of error, in light of the fact that the estate's assignments of error have been overruled, there is no reason to address the merits of the cross-assignment of error. *See Burr v. Nationwide Mut. Ins.*

*Co.*, 9th Dist. Lorain No. , 2013-Ohio-4406, ¶ 27, quoting *Glidden Co. v. Lumbermens Mut. Cas. Co.,* 112 Ohio St.3d 470, 2006-Ohio-6553, ¶ 32 ("[C]ross-assignments of error raised by appellees who have not filed a notice of appeal only may be 'used by the appellee as a shield to protect the judgment of the lower court but may not be used by the appellee as a sword to destroy or modify that judgment.'"); *see also* R.C. 2505.22.

## III.

**{¶44}** The estate's assignments of error are overruled, and, thus, we decline to address the cross-assignment of error. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
JULIE A. SCHAFER
FOR THE COURT


HENSAL, P. J.
CONCURRING.

{¶45} I agree that the trial court correctly denied the estate's motion for judgment notwithstanding the verdict. Dr. Sing testified that, even if Defendants had sent Mr. Scott to an emergency room immediately, its doctors would have referred him to a cardiologist for any tests he required, which is what the Defendants did. Dr. Sing acknowledged that when Mr. Scott had a prior cardiac catheterization, the procedure did not occur until nine days after a problem was first detected in Mr. Scott. Dr. Blatt also acknowledged that Mr. Scott had previously gone through the cardiac work-up that he said should have occurred in this case and that Mr. Scott was not scheduled for a catheterization until 10 days after that work-up was complete. Defendants further point out that their cardiology expert testified that catheterization is not the first step in treating a patient, that he would have had a patient like Mr. Scott undergo a stress test, and that the stress test would probably have been scheduled for a week after he had first seen the patient. All of this testimony suggests that, even if Defendants had sent Mr. Scott to the emergency room, it might have been a week or more before he underwent a catheterization. Because Mr. Scott died only two days after he was treated by Defendants, the procedure would not have been completed in time to save his life. Accordingly, viewing all of the testimony and other evidence presented in a light most favorable to Defendants, I cannot say that reasonable minds could only

come to the conclusion that Defendants' breach of the standard of care was the proximate cause of Mr. Scott's death. *Catalanotto v. Byrd,* 9th Dist. Summit No. 27302, 2015-Ohio-277, ¶ 8, citing Civ.R. 50(B). I also agree that the verdict is not against the manifest weight of the evidence, that the trial court correctly denied the motion for new trial, and that the estate forfeited its jury-interrogatory argument. I, therefore, respectfully concur in the judgment.

CARR, J.
CONCURRING IN PART, AND DISSENTING IN PART.

{¶46} I respectfully dissent from the majority's judgment addressing the estate's assignments of error as I would conclude that the trial court did err in failing to grant the estate's motion for JNOV. However, I concur in judgment with respect to the majority's resolution of the cross-assignment of error.

{¶47} "A medical-malpractice claim requires the plaintiff to 'prove causation through medical expert testimony in terms of probability to establish that the injury was, more likely than not, caused by the defendant's negligence.'" *Segedy v. Cardiothoracic & Vascular Surgery of Akron*, 182 Ohio App.3d 768, 2009-Ohio-2460, ¶ 11 (9th Dist.), quoting *Roberts v. Ohio Permanente Med. Group, Inc.*, 76 Ohio St.3d 483, 485 (1996). "Although the trier of fact may sometimes reject the opinion testimony of an expert witness, there must be reason for it to do so. The trier of fact cannot 'weigh' witness testimony and assess its 'credibility,' unless there are conflicts in the evidence or questions of credibility to be resolved." *Cromer v. Children's Hosp. Med. Ctr. of Akron,* 9th Dist. Summit No. 25632, 2016-Ohio-7461, ¶ 26. "For example, the trier of fact may reject an expert's opinion based on the contradictory opinion testimony of another expert or the expert's own concessions during cross-examination that question the credibility of

his opinion." *Cromer* at ¶ 26. However, "[t]he trier of fact 'may not disregard credible and uncontradicted expert testimony[.]'" *Id.*, quoting *White* at ¶ 74.

{¶48} Pursuant to Civ.R. 59(B), construing the evidence in a light most favorable to Dr. Hensley-Buis and McCluskey, M.D. & Associates, I would conclude that the trial court did err in denying the estate's motion for a JNOV. The estate presented a prima facie case of wrongful death. Further, the jury agreed that Ms. Wolf and Dr. Hensley-Buis breached the standard of care. The jury found that Dr. Hensley-Buis should have sent Mr. Scott directly to the emergency room and that Ms. Wolf failed to follow Dr. Hensley-Buis' recommendation concerning sending Mr. Scott to the emergency room. Additionally, the estate presented expert testimony tying the failure to send Mr. Scott to the emergency room to his death. Dr. Hensley-Buis and McCluskey, M.D. failed to rebut the estate's experts' proximate cause evidence. No alternate proximate cause was presented, nor can it be said that, through cross-examination, Dr. Hensley-Buis and McCluskey, M.D. challenged the estate's experts as to proximate causation or caused them to recant their testimony. *See Wilson v. Ahn,* 1st Dist. Hamilton No. C-020615, 2003-Ohio-4305, ¶ 20. Moreover, to the extent that Dr. Rozman testified that nothing Ms. Wolf did or failed to do contributed to Mr. Scott's death, and to the extent Dr. Hensley-Buis testified similarly with respect to her own care, such testimony is conclusory and insufficient to constitute competent evidence to rebut the proximate causation evidence presented. Further, such testimony, when read in context, at its core, focused on the actions or inactions of the medical personnel and essentially amounted to testimony addressing the standard of care. The crux of Dr. Hensley-Buis' and McCluskey, M.D. & Associates' case was that Dr. Hensley-Buis and Ms. Wolf did not breach the standard of care, and, because of that fact, their actions or inactions likewise could not have been the proximate cause of Mr. Scott's death. The defense expert testimony did not

expressly address whether Mr. Scott would have survived, assuming that he should have been sent to the emergency room.

{¶49} The concurrence notes that, even if Mr. Scott had been referred to the emergency room, much of the testing would not have been conducted until several days later. As Mr. Scott passed away before that testing would have been conducted, the concurrence theorizes that sending Mr. Scott to the emergency room would not have prevented his death. However, that reading of the estate's experts' testimony fails to consider the full scope of the testimony presented. Dr. Sing averred that if Mr. Scott had been sent to the emergency room, he "believe[d] [Mr. Scott] would have been stabilized in terms of intravenous for any emergency, any quick disruption in his cardiac rhythm. If his heart stopped, they could have handled it right there. They would have gotten to the bottom of the chest pain. They would have seen the blockage. He would have been extended and [Dr. Sing] th[ought] he would have survived this whole thing." In addition, Dr. Blatt testified that, based upon his review of Mr. Scott's chart and the depositions, Mr. Scott, at a minimum, "required further observation" and that that type of observation would have taken place at an emergency room. Thus, even if Mr. Scott would have not have received all the testing prior to his death, there is nothing in the record that suggests that Mr. Scott would have been sent home from the emergency room or hospital prior to his death. Instead, the experts' testimony suggests that if Mr. Scott had been sent to the emergency room, he would have been observed and monitored and his fatal heart attack could have been prevented or timely treated.

{¶50} Accordingly, I would conclude that Dr. Hensley-Buis and McCluskey, M.D. & Associates failed to present sufficient evidence to rebut the estate's evidence of proximate cause. I see no basis in the record for the jury to reject the estate's expert's testimony concerning

proximate cause. *See Cromer,* 2016-Ohio-7461, at ¶ 26, quoting *White*, 118 Ohio St.3d 12, 2008-Ohio-1623, at ¶ 74 ("The trier of fact 'may not disregard credible and uncontradicted expert testimony[.]'"). Thus, the estate was entitled to have the motion for JNOV granted, and I would therefore sustain the estate's first assignment of error.

{¶51} This resolution of the first assignment of error would render the estate's remaining assignments of error moot, and I would thus decline to address them. *See* App.R. 12(A)(1)(c). Because the estate was entitled to JNOV with respect to the conduct of both Dr. Hensley-Buis and Ms. Wolf, the matter should be remanded for a determination of damages. As only after the damages are determined could McCluskey, M.D. & Associates even know whether it was prejudiced by the trial court's failure to grant it a directed verdict with respect to Ms. Wolf's conduct, its cross-assignment of error is premature. Accordingly, I would decline to address the cross-assignment of error as well.

APPEARANCES:

THOMAS R. HOULIHAN, Attorney at Law, for Appellant.

MICHAEL OCKERMAN, Attorney at Law, for Appellees.